JOSEPH J. ETGEN, ET UX. *v.* WASHINGTON COUNTY BUILDING & LOAN ASSOCIATION, INC., ET AL.

[No. 12, January Term, 1945.]

*Decided February 28, 1945.*

414

The cause was heard before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, HENDERSON, and MARKELL, JJ.

*John R. Reeves,* with whom was *Joseph J. Etgen* in *pro per* on the brief, for the appellants.

*D. Lindley Sloan,* with whom was *Martin V. B. Bostetter* on the brief, for the appellees.

DELAPLAINE, J., delivered the opinion of the Court.

Joseph J. Etgen and Mary T. Etgen, his wife, prayed the Circuit Court for Montgomery County to restrain Washington County Building and Loan Association, Inc., through Charles E. Remsburg, president, Grover C. Crilley, secretary, and Martin V. B. Bostetter, attorney, from foreclosing a third mortgage for $4,000, which it holds on their real property near Gaithersburg, and to annul the mortgage. This appeal is from a decree dismissing the second amended bill of complaint.

The first contention is that the mortgage was not based upon valuable consideration. It appears that Etgen was one of the promoters who sold capital stock of the building association to the public in 1929 and 1930. He says that many of the purchasers of this stock became dissatisfied, and he was employed by Crilley, secretary of the association, to buy the stock back and resell it, and that at various times from 1932 to 1935 Crilley advanced him cash from association funds with which to buy the stock, and he in turn gave his checks to be held by the association until he was paid by the new stockholders. Etgen also says that it was intended that, after he returned the

cash to the association, he should get his checks back, but that Crilley did not always return them, and that he improperly held ten of his checks in the total amount of $4,010. Crilley, however, denies that he ever employed Etgen to buy any stock from dissatisfied purchasers, but claims that he cashed the checks simply to help Etgen in emergencies.

It is unbelievable that Crilley, as secretary of the corporation, would take corporate funds to cash checks to the extent of $4,010 merely as a favor for a salesman, when they both knew the checks were worthless. Defendants introduced in evidence two telegrams from Etgen, received in July, 1935, one promising to send a check in part payment, and the other offering to sell certain bonds which had been hypothecated with the association. Defendants also produced a copy of a letter mailed to Etgen in March, 1936, in which Crilley said: "It has arrived at the time when there must be something done on your part toward taking up these checks that we are holding here at the Association. * * * You are fully aware of the fact that this whole matter has put me in an embarrassing position with the Board of Directors." Again, on August 11, 1936, Crilley wrote: "I have written you and talked with you personally as well as on the phone many times about these checks we have of yours and are still holding. * * * We continued to help you when you came and claimed you were in desperate trouble, and now you pass it off lightly. * * * You promised some time ago to give a mortgage on your home, that might satisfy."

Etgen denies that he sent the telegrams, but they appear to be his. He also denies that he received any letters from the association. Yet the fact remains that on August 25, 1936, Etgen and his wife signed and sealed and acknowledged before a notary public in Hagerstown a mortgage in which they agreed to pay Washington County Building & Loan Association, Inc., the sum of $4,850 with interest at 6 per cent., and authorized foreclosure in event of default in payments for a period of

three months. Defendants assert that the consideration for the mortgage was the total amount of the unpaid checks with interest thereon. Etgen, however, claims that he and his wife executed the mortgage for no other purpose than to help Crilley in concealing shortages in his accounts. Defendants state that Etgen was allowed credit for his mortgage on a property in Hagerstown, thus reducing his indebtedness to $4,024.12, and an adjustment credit of $24.12 was given, bringing the indebtedness to exactly $4,000. They then state that the mortgage for $4,000, now in question, was executed by the Etgens on May 11, 1937, and the $4,850 mortgage was released. It is incredible that a business man like Etgen, acquainted with securities, corporate promotion and salesmanship, could execute and deliver to a corporation a mortgage reciting an indebtedness of $4,850, and later obtain a release of that mortgage and give a new mortgage for $4,000, and still believe that he never owed the corporation anything. The deferment of foreclosure for six years is probably explained by the fact that the association's third mortgage on the mortgagors' property, considered to be worth less than $15,000, was subordinate to a first mortgage for $10,000 and a second mortgage for $2,700, and it was considered more advisable to try to induce the mortgagors to curtail their indebtedness than to incur the costs of foreclosure.

It is immaterial for the decision of this case whether Crilley used corporate funds for purchase of stock or merely as a favor to Etgen. If we assume that they were still engaged in promoting the sale of stock, they stood in a fiduciary relation to the corporation and to all persons who came into the enterprise as stockholders. A promoter is bound to exercise the utmost good faith and he will not be allowed to benefit by any secret profit or advantage which he may gain at the expense of the corporation or its stockholders. *Hays v. The Georgian, Inc.*, 280 Mass. 10, 181 N. E. 765, 85 A. L. R. 1251; *Moore v. Warrior Coal & Land Co.*, 178 Ala. 234, 59 So. 219; *Cushion Heel Shoe Co. v. Hartt*, 181 Ind. 167, 168,

103 N. E. 1063; *American Forging & Socket Co. v. Wiley,* 206 Mich. 664, 173 N. W. 515, 518; *Dickerman v. Northern Trust Co.,* 176 U. S. 181, 20 S. Ct. 311, 319, 44 L. Ed. 423. If a promoter undertakes to make a profit for himself from his services as promoter without making a full disclosure of the fact for the stockholders and getting their consent, he is guilty of fraud. *Hayward v. Leeson,* 176 Mass. 310, 57 N. E. 656, 661. In *Old Dominion Copper Mining & Smelting Co. v. Bigelow,* 203 Mass. 159, 89 N. E. 193, 206, Justice Rugg said: "The corporation is in the hands of the promoter like clay in the hands of the potter. It is to this person, absolutely helpless and incapable of independent initiative or uncontrolled action, that the promoter stands as trustee. * * * The fiduciary relation must in reason continue until the promoter has completely established according to his plan the being which he has undertaken to create. His liability must be commensurate with the scheme of promotion on which he has embarked. If the plan contemplates merely the organization of the corporation his duties may end there. But if the scheme is more ambitious and includes besides the incorporation, not only the conveyance to it of property but the procurement of a working capital in cash from the public, then the obligation of faithfulness stretches to the length of the plan."

On the other hand, if Crilley cashed the worthless checks merely to help a friend, he was guilty of fraudulent conduct. The corporation had never authorized its secretary to cash worthless checks, and presumably Etgen knew that Crilley was violating his trust as an officer of the corporation. Crilley says that Etgen's account was not kept by the bookkeeper but by him personally; Etgen says that Crilley kept no such account, but concocted it shortly before the trial. Under either version, however, there was an unauthorized use of the corporation's money. Of course, Crilley is liable to the corporation for any loss that might be sustained through his breach of trust. The corporation was not responsible for the fraud, because the fraud was incident to an

act done by the secretary in furtherance of his own scheme, and he was not acting within the scope of his authority when the fraud was committed. It is a general rule that where parties have participated in fraudulent acts, a court of equity will not intervene as between the wrongdoers, but will let them stay in the situation into which they have fallen. *Baltimore American Insurance Co. v. Ulman,* 165 Md. 630, 641, 645, 170 A. 202. It is also held that where two or more persons conspire to carry out a fraud to cheat another, each of them is liable to the defrauded party irrespective of the degree of his activity in the fraudulent transaction or whether he shared in the profits of the scheme. In order to establish liability of a participant in a fraud, it is not necessary to show that he was a party to its contrivance at its inception. If it is shown that he knew of the fraudulent scheme and wilfully aided in its execution, he is chargeable with the consequences. All persons who participate in such a transaction are jointly liable for the ensuing injury regardless of the degree of culpability. *Lomita Land & Water Co. v. Robinson,* 154 Cal. 36, 97 P. 10, 14.

The second ground of attack is that the mortgage, which complainants executed on May 11, 1937, recited a consideration of $3,500, and that the amount was raised and other alterations were made without their consent. Etgen says that he was not aware that the mortgage recited a consideration of $4,000 until 1943, after he was notified by an attorney that the association had decided to foreclose, and it was then that he discovered that the first page of the mortgage had been removed and a new page substituted, and on page 2 the amount of $3,500 had been erased and $4,000 inserted. It is a well-established principle that any material alteration of a written instrument made after its execution by a party to it or with his privity invalidates the instrument as to any non-consenting party. It is also unquestioned that any change in the recited amount in an instrument, whereby it becomes a promise to pay a sum different from that originally expressed, is a material alteration.

*Markoff v. Kreiner*, 180 Md. 150, 154, 23 A. 2d. 19. The record contains a mass of conflicting testimony as to whether the alterations were made in Hagerstown or in Rockville. Bostetter, who prepared the mortgage, says that he dictated the mortgage to his stenographer, not in the amount of $3,500, but in the amount of $3,900, as shown by the stenographic notes, but rewrote the first page changing the amount from $3,900 to $4,000, but he did so before the mortgage was executed, and the Etgens were aware of the change. He also says that he cannot recall the exact time when the changes were made on page 2. Ira N. Gulickson, of Washington, a document examiner, asserts that dates were inserted on the first page and the amount of $3,900 was changed to $4,000 on the second page, and that these alterations were made on a Remington typewriter in the Court House in Rockville. It is not necessary for us to determine when and where the alterations were made, as Etgen and Crilley were confederates in fraud as against the association, and complainants have not come into court with clean hands and are therefore not entitled to relief.

*Decree affirmed with costs.*