# DOMINIC J. COLANDREA *v.* CARMEN J. COLANDREA ET AL.

[No. 985, September Term, 1978.]

*Decided May 9, 1979.*

422

The cause was argued before THOMPSON, LOWE and COUCH, JJ.

*Thomas A. Pavlinic* for appellant.

*Donald F. Chiarello* for appellees.

COUCH, J., delivered the opinion of the Court.

On August 21, 1967 Dominic J. Colandrea and Carmen J. Colandrea, husband and wife, incorporated Cortland Realty, Ltd. The corporation's business of real estate sales and property management prospered until Mr. and Mrs. Colandrea encountered marital difficulties. On September 22, 1972 the Colandreas severed both marital and business ties; on that day a separation and property settlement agreement and a stock redemption agreement [1] were executed.

Enforcement of the stock redemption agreement is the subject of this appeal and cross-appeal. By its terms Mr. Colandrea agreed to sell to Cortland Realty, Ltd. all of his

---

[1] The stock redemption agreement was signed by Mrs. Colandrea in her capacity as president of the corporation.

capital stock in the corporation, numbering fifteen shares, for $100,000. Cortland Realty, Ltd. met its obligation to the extent of $29,000 by making a down payment of $26,060, which was collected at settlement, and by a credit of $2,940 from the corporation to Mr. Colandrea. The balance of the purchase price, $71,000, was to be paid by Cortland Realty, Ltd. in yearly installments set forth in the agreement and evidenced by seven promissory notes attached to it. The first note, due on October 15, 1973, called for payment of $11,000. The remaining six notes, due on October 15 of the succeeding years, have a face value of $10,000 apiece. Each of the notes provides for interest at the rate of six per cent per annum.

When the first note matured over a year after the execution of the stock redemption, Cortland Realty, Ltd.'s financial condition was so precarious that it was unable to meet its obligation to Mr. Colandrea. Cortland Realty, Ltd.'s earnings for the years immediately preceding and following the 1972 stock redemption agreement were as follows:

| | |
|---|---|
| Oct. 1971 — Sept. 1972 [2] | $572,635 |
| Oct. 1972 — Sept. 1973 | 328,873 |
| Oct. 1973 — Sept. 1974 | 64,367 |
| Oct. 1974 — Sept. 1975 | 5,566 |
| Oct. 1975 — Sept. 1976 | 4,952 |

By the time Mr. Colandrea filed his bill of complaint, five of the promissory notes totaling $51,000, with interest of $10,500, were in default. Left a creditor of a barren corporation, Mr. Colandrea found it necessary to look elsewhere for payment of the promissory notes.

Within three months of the execution of the stock redemption agreement Mrs. Colandrea incorporated Cortland, Ltd. which assumed Cortland Realty, Ltd.'s real estate sales operation. According to Mrs. Colandrea real estate sales comprised the far greater portion of Cortland Realty, Ltd.'s business. The corporate name of Cortland Realty, Ltd. was changed to Carmen Management Company, Inc. thirteen months after the stock redemption agreement

---

2. The corporation operated on an October to September fiscal year.

was signed. Carmen Management continued the management of rental properties in which Cortland Realty, Ltd. was previously engaged. Bearing in mind the date of the stock redemption agreement, September 22, 1972, we shall review the history of Cortland Realty, Ltd., Cortland, Ltd., and Carmen Management Company, Inc.

From the date of its incorporation on August 21, 1967 until December 29, 1972, Cortland Realty, Ltd. functioned as a real estate sales corporation, realizing the greater portion of its income from the sale of commercial and residential properties. On December 29, 1972, Cortland, Ltd. was incorporated. Thereafter, Cortland Realty, Ltd.'s income was derived primarily from leasing and management commissions. Although no real estate listings were transferred from Cortland Realty, Ltd. to Cortland, Ltd., all new listings were taken under the brokerage Cortland, Ltd. Cortland, Ltd. operated in all locations that were formerly offices of Cortland Realty, Ltd. Cortland, Ltd. used the same furniture, phone number, and corporate logo as Cortland Realty, Ltd. All real estate agents associated with Cortland Realty, Ltd. transferred their licenses to Cortland, Ltd. The only real distinction between the business of Cortland, Ltd. and that of Cortland Realty, Ltd. was that Cortland, Ltd. did not solicit rental management accounts. This last remaining function of Cortland Realty, Ltd., however, was not long-lived. On October 18, 1973 Mrs. Colandrea, her son, and her attorney changed the name of Cortland Realty, Ltd. to Carmen Management Company, Inc. This renamed corporation continued the property management segment of Cortland Realty, Ltd.'s business as a consequence of the corporate name change. On the same date Cortland Realty, Ltd. was reincorporated, but its existence continued only on paper. The State Department of Assessments and Taxation annulled Cortland Realty, Ltd.'s charter on January 21, 1976.

The evidence adduced at trial reveals that Mrs. Colandrea became the sole shareholder in Cortland Realty, Ltd. after the stock redemption agreement. She was also a director and president of that first corporation. The same situation prevails with respect to the two later corporations, Cortland,

Ltd. and Carmen Management Company, Inc. Cortland, Ltd. became the chief beneficiary of the demise of Cortland Realty, Ltd. Its earnings for the fiscal years following its incorporation are listed below:

| Fiscal Year | Gross Commissions |
|---|---|
| May 1973 — April 1974 | $ 870,504 |
| May 1974 — April 1975 | 535,609 |
| May 1975 — April 1976 | 645,373 |

Carmen Management Company, Inc., having assumed the less lucrative management operation, had earnings of $5,566 for fiscal year 1974 and $4,952 for 1975. The effect of all these corporate machinations is obvious. By it Mrs. Colandrea was able to continue the profitable business of Cortland Realty, Ltd. without its attendant obligations to Mr. Colandrea.

In order to recover payment of the promissory notes, Mr. Colandrea filed a Bill of Complaint in Equity against Cortland Realty, Ltd., Cortland, Ltd., Carmen Management Company, Inc., and Mrs. Colandrea, individually and in her capacity as president, officer and director of Cortland Realty, Ltd., Cortland, Ltd., and Carmen Management Company, Inc. The ultimate purpose of Mr. Colandrea's complaint was to impose liability for the payment of the notes upon Cortland, Ltd., Carmen Management Company, Inc., and Mrs. Colandrea, personally. The above named corporations and Mrs. Colandrea then filed a counterclaim against Dominic J. Colandrea, Richard C. Adams, Irene Adams, Joan Bounds and El Toro Realty, Inc., charging, *inter alia,* breach of the stock redemption agreement by conducting a competing real estate business and injuring Cortland Realty, Ltd. by soliciting its clients and customers and divulging confidential information, and tortious interference with the contract rights of Cortland Realty, Ltd. and Mrs. Colandrea. The chancellor dismissed the counterclaim as to all counterdefendants, stating specifically that "there isn't any evidence that would be sufficient to show that he carried on any activities that were adverse to Cortland [Realty, Ltd.]. He may have, but there certainly isn't any evidence to say he did."

The chancellor filed his written opinion on June 21, 1978 and passed on order dated August 22, 1978 entering judgment against the corporate defendants Cortland, Ltd. and Carmen Management Company, Inc. in the amount of $61,500 plus interest. The order further stated that no liability existed on the part of Mrs. Colandrea, individually, upon the notes.

The chancellor, in his written opinion, elaborated upon his decision to spare Mrs. Colandrea liability on the notes. His conclusion was based upon the rationale that there was no fraud or paramount equity present as a result of her actions; Mrs. Colandrea's manipulations of the corporations were based, according to the chancellor, upon "sound corporate reasons". There was, therefore, no intent to defraud on Mrs. Colandrea's part and thus no justification for piercing the corporate veil. Upon examination of the record we are persuaded that, sound corporate reasons or not, there is clear and convincing proof that Mrs. Colandrea's transfer of the business of Cortland Realty, Ltd. to Cortland, Ltd. and Carmen Management Company, Inc. constitutes fraud. The testimony of Mrs. Colandrea, coupled with the patent misrepresentation of the stock redemption agreement and promissory notes that the debt would be paid, compel us to conclude that the chancellor's judgment on the evidence relative to fraud was clearly erroneous. Md. R. 1086. Our reasons will be set forth in detail.

The chancellor did, however, find liability on the part of Cortland, Ltd. and Carmen Management Company, Inc. based upon his conclusion that the two corporations were the results of corporate reorganizations and, hence, were mere continuations of Cortland Realty, Ltd. *See generally, Fletcher Cyclopedia Corporation,* §§ 7205, 7329 (1973); 19 C.J.S., *Corporations,* §§ 1578, 1593 (1940); 19 Am. Jur. 2d, *Corporations,* §§ 1550, 1559 (1965). We shall affirm the judgments against Cortland, Ltd. and Carmen Management Company, Inc. but for a different reason.

On appeal Mr. Colandrea raises the following issues:

1. Did the trial court err in refusing to impose liability on the individual defendant, Carmen J. Colandrea, by failing to enforce a paramount equity?

2. Did the trial court err in refusing to impose liability on the individual defendant, Carmen J. Colandrea, by failing to make a finding of fraud?

3. Did the trial court err in refusing to impose liability on the individual defendant, Carmen J. Colandrea, by failing to make a finding of fraudulent conveyance?

Additional issues are raised by cross-appellants, Cortland Realty, Ltd., Carmen Management Company, Inc., Cortland, Ltd., and Carmen J. Colandrea:

4. Did the trial court err in imposing liability upon Cortland, Ltd. and Carmen Management Company, Inc. for the debts and obligations of Cortland Realty, Ltd. since cross-appellee failed to provide clear and convincing evidence of fraud or a paramount equity? [3]

5. Did the trial court err in holding Cortland, Ltd. and Carmen Management Company, Inc. liable as the successors of Cortland Realty, Ltd.?

In an effort to avoid confusion we shall address the issues raised by the parties by considering the liability of first Mrs. Colandrea and then Cortland, Ltd. and Carmen Management Company, Inc.

## A. The Liability of Mrs. Colandrea

Mr. Colandrea contends, and we agree, that Mrs. Colandrea has committed a fraud and thus cannot be shielded against individual liability upon the promissory notes by the corporate fiction of Cortland Realty, Ltd. This Court and the Court of Appeals have repeatedly stated that we will, in an appropriate case:

"disregard the corporate entity and deal with substance rather than form, as though a corporation does not exist, * * * shareholders generally

---

3. This issue is misstated since the chancellor held none of the cross-appellants liable upon the ground of fraud or paramount equity.

are not held liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity." (Citation omitted.) *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.,* 275 Md. 295, 310-11, 340 A. 2d 225, 234 (1975).

See *Dixon v. The Process Corp.,* 38 Md. App. 644, 654, 382 A. 2d 893 (1978), *cert. den.,* 282 Md. 731. We shall disregard the corporate entity of Cortland Realty, Ltd. and impose liability upon its sole shareholder because Mrs. Colandrea's dealings, through the corporation, with Mr. Colandrea, can be termed · nothing short of fraudulent.

In order to establish fraud on the part of Mrs. Colandrea it was necessary that appellant provide clear and convincing proof, *see Garris v. Dickey,* 22 Md. App. 618, 630, 325 A. 2d 156 (1974), *cert. den.,* 273 Md. 720 (constructive fraud), *Loyola Fed. S. & L. Ass'n. v. Trenchcraft, Inc.,* 17 Md. App. 646, 656, 303 A. 2d 432 (1973), of each of the following five elements: (1) a material representation of a party was false, (2) falsity was known to that party or the misrepresentation was made with such reckless indifference to the truth as to impute knowledge to him, (3) the misrepresentation was made with the purpose to defraud (scienter), (4) the person justifiably relied on the misrepresentation, and (5) the person suffered damage directly resulting from the misrepresentation. *Suburban Properties Management, Inc. v. Johnson,* 236 Md. 455, 460, 204 A. 2d 326 (1964); *accord Walsh v. Edwards,* 233 Md. 552, 558, 197 A. 2d 424 (1964); *Lustine Chevrolet v. Cadeaux,* 19 Md. App. 30, 34-5, 308 A. 2d 747 (1973).

The trial court, in refusing to pierce the corporate veil in this instance, stated that the evidence revealed that "any decision made by Mrs. Colandrea in regard to the corporations was made because of sound corporate reasons", thus negating the element of scienter. The "sound corporate reasons" for the creation of Cortland, Ltd. and Carmen Management Company, Inc. cited by the trial court [4] included

---

4. There was a third reason mentioned by the trial court but it was not specifically relied upon by the chancellor. According to Mrs. Colandrea's testimony the decision to change Cortland Realty, Ltd.'s name to Carmen Management Company, Inc. was made to identify non-residential sales

(1) Mrs. Colandrea's suspicions that Mr. Colandrea was raiding Cortland Realty, Ltd. of its sales personnel, and (2) the filing of a race discrimination suit against Cortland Realty, Ltd. several weeks prior to the execution of the stock redemption agreement. The chancellor's ruling that there was no fraud or paramount equity was based upon the credibility of Mrs. Colandrea's testimony. Normally, under the authority of Md. R. 1086, we would not interfere with the trial court's judgment in this regard, *see Carling Brewing Co. v. Belzner,* 15 Md. App. 406, 411-12, 291 A. 2d 175 (1972), but the reasons given by Mrs. Colandrea are so devoid of merit that we must conclude the chancellor was clearly erroneous in his judgment on the evidence. *Cf. Dixon v. The Process Corp., supra* at 655.

As to the first of the reasons relied upon by the chancellor, we are at a loss to understand his acceptance of Mrs. Colandrea's suspicions that appellant was raiding Cortland Realty, Ltd. as "sound corporate reasons" when he had earlier dismissed the counterclaim embodying those suspicions for lack of sufficient evidence.

The other reason given by Mrs. Colandrea and relied upon by the chancellor is similarly without basis. According to Mrs. Colandrea's testimony the incorporation of Cortland, Ltd. was prompted by a racial discrimination suit directed at Cortland Realty, Ltd.'s activities in the management of rental properties. As a result Mrs. Colandrea thought it best to separate the real estate sales and management functions of the original corporations. The chancellor's reliance on Mrs. Colandrea's rationale overlooks the fact that the presence of the pending litigation constituted a direct violation of a representation and warranty contained in the stock redemption agreement, which is as follows:

> ". . . no judgment, lien, suit, claim or proceeding pending or threatened against the Corporation anywhere; no condition, act or event which would constitute a breach or default by the Corporation; no

---

functions with a non-residential sales corporate name and to comply with a national real estate campaign to use "realtor" only in the corporate name of a residential sales entity.

other basis for the assertion against the Corporation of any claim or liability not fully reflected or reserved against in the books of the Corporation."

The discrimination suit was filed on August 31, 1972, less than a month before execution of the stock redemption agreement. This statement in and of itself constitutes actionable fraud, assuming the presence of clear and convincing proof of the other elements. Indeed, that theory is urged upon us by Mr. Colandrea. But we need not go into this aspect, for there is far more convincing evidence of fraud which was neglected by the trial court.

Regardless of whether there were sound corporate reasons for the creation of the new corporations which deprived Cortland, Realty, Ltd. of its ability to pay the notes, we think the trial court clearly erred in failing to consider Mrs. Colandrea's admission in a deposition, read into the record, that at the time she signed the agreement on behalf of the corporation, she had no intention of paying the notes. The relevant portion of her deposition follows:

"Q. I see. Based on what you testified to, am I correct in assuming that part of your reason for incorporating Cortland, Ltd. was to start a fresh corporation free of any liabilities?

Objection. You may answer.

A. That was one of the reasons, that's correct.

Q. You previously gave other reasons.

A. That's correct.

Q. Was it your position, at the time, as officer and/or director of Cortland Realty, Ltd. and also Cortland, Ltd., that there would not have to be any pay back of those notes from the original corporation.

A. I'm sorry. What was the first part of your question?

Q. In your capacity as officer and/or director of either of those corporations, once the new

corporation was formed, was it your intention, at that time, to circumvent your payments of those notes back to Mr. Colandrea?

A. No sir.

Q. Did you have the intention, at that time, to pay these notes back to Mr. Colandrea?

A. No, I did not.

Q. To the corporation?

A. I did not.

Q. You had no intention at that time?

A. No, because I thought it was unfair.

Q. What did you think was unfair?

A. I thought it was unfair that: number one, he would expect payment when the money was not there or would seriously jeopardize the health of the corporation which was the support of his children. Number two, it was unfair due to the fact of the fraud, that the corporation should have to pay him.

Q. So that when the new corporation was formed, then, you had no intention, the corporate defendant, Cortland Realty Ltd., had no intention of making any pay back on those notes.

A. The new corporation had nothing to do with it."

In *Tufts v. Poore,* 219 Md. 1, 147 A. 2d 717 (1959), the Court of Appeals stated:

> "Maryland has adopted the overwhelming majority rule of the American courts in holding that fraud may be predicated on promises made with a present intention not to perform. . . . The gist of the fraud in such cases is not the failure to perform the agreement, but the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact non-existent, and the deception of the promisee by such false promise." *Id.* at 11-12.

432

Cortland Realty, Ltd., through its president, Mrs. Colandrea, entered into the stock redemption agreement with the deliberate intention and purpose of cheating and defrauding Mr. Colandrea, the other party to the contract. The Court of Appeals has given fair warning as to the repercussions of such fraudulent acts of an agent:

> "In such a case not only is the corporation liable for such action, but the agents who engage in the conspiracy are personally liable for damages resulting from such a transaction. Agents of a corporation ... cannot hide behind the corporate shield and say they were acting solely as the agents of the corporation." *Ace Development Co. v. Harrison,* 196 Md. 357, 367, 76 A. 2d 566 (1950).

Mrs. Colandrea obviously had no intention of permitting payment of the promissory notes by Cortland Realty, Ltd. But by entering into the agreement she was able to relieve Mr. Colandrea of his stock in the corporation. "... [W]here one person induces another to part with his money or property by means of a promise which he makes with the intention of not performing it, he is guilty of actionable fraud." *Appel v. Hupfield,* 198 Md. 374, 382, 84 A. 2d 94 (1951).

The evidence presented by Mr. Colandrea meets all of the elements of fraud in accordance with the applicable burden of proof. The corporation's promise to pay Mr. Colandrea the full purchase price of the stock was a sham in light of Mrs. Colandrea's admission; the falsity of this representation was known to Mrs. Colandrea when she signed the agreement on behalf of the corporation. Her statement constitutes clear and convincing evidence of an intention to defraud and, although there is no direct evidence on the point, a fair inference can be drawn that Mr. Colandrea justifiably relied on the corporation's promise to pay the notes in turning over his fifteen shares to the corporation. There can be little doubt that the corporation's failure to meet its obligations to Mr. Colandrea has caused damage, at a minimum $71,000 worth, directly resulting from the fact that there was no intention to pay the promissory notes.

Mrs. Colandrea cannot now hide behind the facades of the corporations which she has created. The principles enunciated by the Court of Appeals in *Crocker v. Pitti,* 179 Md. 52, 16 A. 2d 875 (1940), are fully applicable to Mrs. Colandrea's attempt to avoid the obligations contained in the stock redemption agreement and promissory notes.

> "Nor may it be successfully urged that the perpetration of fraud shall endure because accomplished through the medium of a corporate fiction. The alleged chief actor in the fraud is asserted to have dominated and controlled the intervening corporate entities and, through that domination and control, to have accomplished his personal ends and enterprises. It is appropriate that equity should deal with him according to the verities and not to his simulations. Where fraud exists, equity is equal to the occasion no matter how fair and regular the disguise it may assume." *Id.* at 58.

*See generally, Danzer & Co. v. Western Maryland Railway Co.,* 164 Md. 448, 457, 165 A. 463 (1933); *Dixon v. The Process Corp., supra* at 651. Given the pervasive presence of fraud in this case, we conclude that the chancellor erred in refusing to disregard the corporate entity of Cortland Realty, Ltd. and impose personal liability on the promissory notes upon the perpetrator of the fraud, Mrs. Colandrea.

### B. Liability of Cortland, Ltd. and Carmen Management Company, Inc.

### (1) *Reorganization*

We approve of the chancellor's imposition of liability for the promissory notes upon Cortland, Ltd. but we disagree as to his method in reaching that conclusion. The chancellor, in his written opinion, determined the liability of the two later corporations upon the following basis:

> "These notes which were the liabilities of Cortland Realty, Ltd. became the liabilities of Cortland Ltd. and Carmen Management Company, Inc. Cortland

Realty, Ltd. by reorganization became Cortland Ltd. and Carmen Management Company, Inc. Cortland Ltd. was incorporated on December 29, 1972 and it assumed the real estate functions of Cortland Realty, Ltd. After the incorporation Cortland Realty, Ltd. ceased for all effective purposes to be a corporation involved in the sale of real estate. On October 18, 1973 Cortland Realty, Ltd. changed its name to Carmen Management Company, Inc. and Cortland Realty, Ltd.'s charter was annulled in 1976. The assets of Cortland Ltd. and Carmen Management Company, Inc. were largely the assets of Cortland Realty, Ltd."

The chancellor relied upon the authority of *Fletcher Cyclopedia Corporation,* § 7205 at 395, which posits that where a corporation is reorganized without a foreclosure the reorganized company is liable for the debts of the old corporation. *See also Fletcher, supra,* § 7329; 19 C.J.S., *Corporations,* §§ 1578, 1593; 19 Am. Jur. 2d, *Corporations,* §§ 1550, 1559. In *Bart Arconti & Sons v. Ames-Ennis, supra,* the Court of Appeals analyzed, according to the theory relied upon by the chancellor, a situation quite similar to the one presented here. In *Bart Arconti* a general contractor sued for breach of contract a subcontractor engaged in the business of ceramic tile masonry construction, its principals and two corporations controlled by it; one corporation solely conducted ceramic tile work while the other company exclusively performed masonry construction. All corporations operated at the same place of business, shared the same equipment and employed the same personnel. Stock in all corporations was owned by the same people. The subcontractor, previously a profitable concern, was permitted to become dormant pursuant to a Board of Directors' resolution "that the Company would cease to operate and [would] lie dormant until the litigation . . . can be completed."

The Court of Appeals reversed the judgment entered against the two controlled corporations, stating:

"The recovery against G & L and Atlas rests upon an even more tenuous reed. Appellee seems to

recognize that to prevail in this regard, it must do so upon the premise that two corporations are successors in interest to Arconti. It urges upon us the principle, relying heavily on *Stanford Hotel Co. v. Schwind Co.,* 180 Cal. 348, 181 P. 780 (1919) that 'where a new corporation reorganizes under a new name, but with practically the same stockholders and directors, and continues to carry on the same business, a court of equity will regard the new corporation as a continuation of the former corporation, and will hold it liable for the debts of the former corporation.' 181 P. at 783. The short answer here is that neither of the two corporations are shown by the evidence to be successors of Arconti." 275 Md. at 313.

The evidence produced in the present case revealed that Cortland, Ltd. operated in all locations previously occupied by Cortland Realty, Ltd.; the same furniture was used; the phone number remained the same; most agents associated with Cortland Realty, Ltd. transferred their licenses to Cortland, Ltd.; and finally, the same corporate logo was used in conjunction with the new corporation, Cortland, Ltd. Between December 29, 1972 and October 18, 1973, Cortland Realty, Ltd. functioned as a property management corporation, but as of the latter date all those functions were taken over by Carmen Management Company, Inc. The only factor which distinguishes the instant case from *Arconti* is the close similarity in the names of Cortland Realty, Ltd. and Cortland, Ltd. We do not, however, think this sufficient to take this case out of the purview of *Arconti* and, of course, with respect to Carmen Management Company, Inc., this factor is nonexistent.

Appellant has proffered nothing which would distinguish the evidence presented here from that which formed the basis of the Court of Appeals' decision in *Arconti.* Thus, Cortland, Ltd. and Carmen Management Company, Inc. cannot properly be held liable for the obligations of Cortland Realty, Ltd. on the theory that they are successors to Cortland Realty, Ltd.

(2) *Participation in the fraudulent activities of Mrs. Colandrea*

Mrs. Colandrea was and is a director, officer, and sole stockholder of all three of the named corporate defendants. Mrs. Colandrea's acts as an officer of the two corporations constitute the acts of the corporations themselves where those acts are in furtherance of the corporations' business. *Silver Spring Development v. Guertler,* 257 Md. 291, 297, 262 A. 2d 749 (1970). It was only through the incorporation of Cortland, Ltd. and Carmen Management Company, Inc. that she was able to evade payment of the promissory notes without damaging the profitable real estate business which she controlled. Moreover, the new corporations were the chief beneficiaries of the fraud, insofar as they continued the business of Cortland Realty, Ltd., without its attendant responsibilities. Although neither Cortland, Ltd. nor Carmen Management Company, Inc. were in existence at the time the misrepresentation was made, there is authority for the proposition that they may be held liable for their participation, especially since their creation was part and parcel of Mrs. Colandrea's scheme to avoid payment of the notes. Support for this view that Cortland, Ltd. and Carmen Management Company, Inc. are jointly liable with Mrs. Colandrea can be found in *Etgen v. Washington County Bldg. & Loan Ass'n.,* 184 Md. 412, 41 A. 2d 290 (1945):

> ". . .[W]here two or more persons conspire to carry out a fraud to cheat another, each of them is liable to the defrauded party irrespective of the degree of his activity in the fraudulent transaction or whether he shared in the profits of the scheme. In order to establish liability of a participant in a fraud, it is not necessary to show that he was a party to its contrivance at its inception. If it is shown that he knew of the fraudulent scheme and willfully aided in its execution, he is chargeable with the consequences. All persons who participate in such a transaction are jointly liable for the ensuing injury regardless of the degree of culpability. *Lomita Land*

*& Water Co. v. Robinson,* 154 Cal. 36, 97 P. 10, 14."
*Id.* at 418.

Moreover, the fraud was not complete until the actual damage occurred on October 15, 1973 when the first note came due and Cortland Realty, Ltd. was unable to pay it because Cortland, Ltd. was conducting its real estate sales business and receiving the profits from it. On October 18, 1973, three days after the first note matured, Cortland Realty, Ltd. changed its name to Carmen Management Company, Inc.

Cortland, Ltd. and Carmen Management Company, Inc. became participants in the commission of fraud through the actions of their officer and agent, Mrs. Colandrea. It is well settled in Maryland that a corporation will be held liable for the fraudulent conduct of its agent:

> "Strictly speaking, corporations while acting within the scope of the powers delegated to them, cannot be guilty of wilful fraud; yet it is settled . . . that corporations, carrying on trade or business of any kind, are equally, and to the same extent, liable for the frauds and wrongs of their agents, perpetrated in the course of their employment, as individual principals would be under like circumstances." *Western Maryland R. R. Co. v. Franklin Bank,* 60 Md. 36, 43 (1883).

*See also Ace Development Co. v. Harrison, supra; see generally,* 19 C.J.S., *Corporations,* § 1278 (1940); 37 Am. Jur. 2d, *Fraud & Deceit,* § 305 (1968). Without question, the two later corporations were essential participants; without them Mrs. Colandrea could not have realized her intention to avoid payment of the promissory notes.

(3) *Fraudulent conveyance of the assets of Cortland Realty, Ltd. to Cortland, Ltd.*

Appellant raises an alternative route upon which he urges us to impose liability on Mrs. Colandrea. According to appellant the evidence demonstrates that there was a fraudulent conveyance, see *Comm. Law Art.,* § 15-201, *et seq.,* of the assets of Cortland Realty, Ltd. to the new

corporation, Cortland, Ltd. This issue was presented by appellant below but was not decided by the trial court. Under Md. R. 1085 we would ordinarily not review the question, but we may do so where we deem it desirable, as we do in this case, to avoid the expense and delay of another appeal. *See e.g., Aetna Cas. & Sur. Co. v. Brethren Mut. Ins. Co.,* 38 Md. App. 197, 379 A. 2d 1234 (1977); *Davidson v. State,* 18 Md. App. 61, 305 A. 2d 474 (1973), *cert. den.,* 269 Md. 757.

Appellant would have us reverse the chancellor and enter judgment against Mrs. Colandrea, individually, for the alleged fraudulent conveyance of Cortland Realty, Ltd.'s assets. Having already determined Mrs. Colandrea's liability upon the fraud issue, we believe it is unnecessary to address this issue in the context of Mrs. Colandrea's personal liability. This does not mean, however, that Mr. Colandrea is without relief under the Uniform Fraudulent Conveyance Act. Md. Code, *Comm. Law Art.,* § 15-201, et seq. (1975).

The Court of Appeals in *Bart Arconti,* and earlier in *Damazo v. Wahby, supra* at 635, indicated that an acceptable method by which Mr. Colandrea could secure payment of the notes by Cortland, Ltd. and Carmen Management Company, Inc. would be to pursue any assets which may have been transferred from Cortland Realty, Ltd. to the two later corporations by fraudulent conveyance.

Cortland, Ltd., after its incorporation on December 29, 1972, operated in the former business locations of Cortland Realty, Ltd. with the same sales agents, phone number, furniture and corporate logo.

One specifically identifiable transfer of an asset can be found in the source of the salary paid to Nan Casciaro. Ms. Casciaro testified that she began working for Cortland Realty, Ltd. in late 1969. She was then employed by Cortland, Ltd. in "early 1973", as a sales manager. According to her testimony Ms. Casciaro's 1973 W-2 form indicated that she was paid a salary of $16,794 by Cortland Realty, Ltd. for her work as a sales manager for Cortland, Ltd. Additionally, Cortland Realty, Ltd.'s U.S. corporate income tax return for the fiscal year October, 1972 through September, 1973 showed expenses of $329,362, largely comprised of compensation to the officers of Cortland Realty, Ltd. salary,

wages, and rent. Essentially, Cortland Realty, Ltd. picked up the tab for Cortland, Ltd.'s first year of business. This conclusion is facilitated by Mrs. Colandrea's testimony that Cortland Realty, Ltd. ceased functioning as a viable sales entity as of December 29, 1972. For fiscal year 1974, the year in which Cortland Realty, Ltd.[5] operated solely as a management business, it incurred expenses of $25,170. The expenses for the management side of the business included rents and secretarial services and office help and are obviously minimal in comparison to the overhead involved in real estate sales.

It is evident that the chief asset of Cortland Realty, Ltd., the operating capital from its gross income for fiscal year 1973, was expended on behalf of Cortland, Ltd. Section 15-207 of Md. Code, *Comm. Law Art.* (1975), provides that "every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors." The lack of consideration for Cortland Realty, Ltd.'s payment of the operating expenses, an "obligation incurred", of Cortland, Ltd. is itself sufficient indicia of fraud, *Berger v. Hi-Gear Tire & Auto,* 257 Md. 470, 476-77, 263 A. 2d 507 (1970), when coupled with the actual intent of Mrs. Colandrea, as an officer of the corporations, previously discussed, to defraud a creditor of Cortland Realty, Ltd., to lead us to conclude that there was a fraudulent conveyance of the assets of Cortland Realty, Ltd. to Cortland, Ltd. There is no evidence in the record which indicates that any consideration passed between Cortland, Ltd. and Cortland Realty, Ltd. for the payment of the second Cortland's debts.

Appellant also argues the good will of Cortland Realty, Ltd. was transferred to Cortland, Ltd. This presents us with something of a novel question; may good will be considered an "asset", Md. Code, *Comm. Law Art.,* § 15-201 (b), which can be fraudulently conveyed. There is some authority to the effect that the good will of a business, in and of itself, is not an asset available to creditors and therefore cannot be the

5. It was also during this year that its name was changed to Carmen Management Company, Inc.

subject of a fraudulent conveyance. *See generally,* 37 Am. Jur. 2d, *Fraudulent Conveyances,* § 100 (1968). The premise upon which this view is based is that good will alone is not a proper subject of attachment. *National Surety Co. v. Fowler,* 217 Ala. 25, 27, 114 So. 408 (1927); *Maitland v. Slutsky,* 281 Mich. 669, 675, 275 N. W. 726 (1937).

We think this interpretation is too narrow for several reasons. Chief among them is appellant's requested remedy. Mr. Colandrea seeks an *in personam* judgment against Cortland, Ltd., not an attachment of that ethereal concept "good will". The Court of Appeals in *Damazo v. Wahby,* 269 Md. 252, 305 A. 2d 138 (1973) (*Damazo* II), indicated that if the subject of the fraudulent conveyance cannot be reached, the person defrauded should be able to recover from the person to whom the transfer was wrongfully made, and through whose hands it passed. *Id.* at 256. Good will, by its very nature, is not such property, that if fraudulently conveyed, is suitable to the ordinary remedies listed in *Comm. Law Art.,* §§ 15-209 and 210. Specifically, those remedies include setting aside the conveyance, annulling the obligation, or disregarding the conveyance and attaching or levying execution on the property.

Furthermore, we do not believe that the good will of a corporation should be considered separate and apart from the business it generates. Good will has been defined by the Court of Appeals as:

> "The advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, *or from celebrity or reputation for skill, or affluence or punctuality,* or from other accidental circumstances or necessities, or even from ancient penalties or prejudices." (Emphasis in original) (Citations omitted.) *Brown v. Benzinger,* 118 Md. 29, 35, 84 A. 79 (1912).

Thus, under the commonly recognized definition of good will,

*id.* at 35, good will should be considered as an incident to the business which it benefits. Furthermore, under Md. Code, *Corps. & Ass'ns.,* § 1-101 (d) (1975), good will is considered to be an asset of a corporation.

In a business such as real estate sales, good will constitutes an integral and necessary ingredient for success. A fully successful real estate sales corporation simply does not spring up overnight. The retention of the name "Cortland", in and of itself, given the years of experience behind it and its reputation in the community, is sufficient proof of a transfer of good will. Good will, in this context, cannot be considered in a vacuum. The new listings acquired by Cortland, Ltd. are attributable in large part to the previous success of Cortland Realty, Ltd. The tangible expressions of good will in this instance are the commissions received from the listings by Cortland, Ltd. Accordingly, we see no difficulty in concluding that good will is an asset capable of being fraudulently conveyed. In reality the good will transferred from Cortland Realty, Ltd. to Cortland, Ltd. has been placed beyond the reach of the court by the transferee, Cortland, Ltd. In this situation "equity will not allow itself to be frustrated but will adapt its relief to the exigencies of the case and will enter a money judgment if this will achieve an equitable result." *Damazo* II, *supra* at 257.

> *Judgment reversed as to Carmen J. Colandrea, individually; case remanded for entry of an order consistent with this opinion.*
>
> *Judgments affirmed as to Cortland, Ltd. and Carmen Management Company, Inc.*
>
> *Judgment in favor of Dominic J. Colandrea on counterclaims affirmed.*
>
> *Costs to be paid by appellees/cross-appellants, one-half by Carmen J. Colandrea, individually, one-half by Cortland, Ltd. and Carmen Management Company, Inc.*