In re TRANSCOLOR CORPORATION,
Debtor.

National City Bank of Minneapolis,
Plaintiff,

v.

Morton M. Lapides, Sr.,
et al., Defendants.

Bankruptcy No. 98–6–5483–JS.
Adversary No. 99–5627–JS.

United States Bankruptcy Court,
D. Maryland.

June 13, 2003.

Gregory Alan Cross, Andrew M. Dansicker, Venable, Baetjer and Howard, LLP, Baltimore, MD, Counsel for National City Bank.

Gerald F. Chapman, Bethesda, MD, Eric S. Lipsetts, Jepsen & Lipsetts, Annapolis, MD, Counsel for Morton M. Lapides, MML, Inc. and Alleco, Inc.

Monique D. Almy, Swidler, Berlin, Shereff and Friedman, LLP, Washington, D.C., Chapter 7 Trustee.

## MEMORANDUM OPINION GRANTING COMPLAINT AGAINST MORTON M. LAPIDES, SR., AND ALLECO, INC., FOR FRAUDULENT MISREPRESENTATION, FRAUDULENT CONCEALMENT AND FRAUDULENT CONVEYANCE

JAMES F. SCHNEIDER, Chief Judge.

This opinion stands for the proposition that the holder of a claim against a Chapter 7 debtor corporation has standing to sue on the claim in the bankruptcy court against the debtor and the debtor's alter ego whose fraudulent misrepresentations on behalf of the debtor caused injury to the plaintiff and gave rise to the claim.

The instant complaint was brought by National City Bank of Minneapolis ("NCB") as trustee under certain trust indentures against Morton M. Lapides, Sr., and various corporations that he owned or controlled [1], including the debtor, Transcolor Corporation ("Transcolor"), for misrepresentation, concealment by breach of duty to disclose and fraudulent conveyance. For the reasons stated, the complaint will be granted against Morton M. Lapides, Sr., and Alleco, Inc.[2]

---

1. MML, Inc., Transcolor Corporation, Transcolor East, Inc., Transcolor West, Inc., American Basics Co., and Alleco, Inc.

2. At the conclusion of trial on the merits of this matter, the Court announced its decision in which it found the defendants, Morton M. Lapides, Sr., and Alleco, Inc., jointly and sev-

## FINDINGS OF FACT

On November 2, 1998, the instant involuntary Chapter 7 bankruptcy petition was filed in this Court against Transcolor by secured creditors Dean H. Foltz, Henrietta M. Foltz, and the Ronald S. Weidenbach Family Trust, debenture holders under two indentures, and later joined by NCB, the indenture trustee. On April 26, 1999, an order for relief under Chapter 7 was entered and on April 30, 1999, Monique D. Almy, Esquire, was appointed trustee.

On January 24, 2001, in response to the trustee's notice to file claims due to the recovery of assets, NCB filed Claim No. 4 in the amount of $6,772,161, plus interest

and costs.[3] The claim was based upon a default judgment obtained by NCB against Transcolor in a Michigan state court on January 22, 1998. The judgment was also against Transcolor's parent corporation, Alleco, Inc., for breach of contract. Proof of claim of NCB.

## THE TRUST INDENTURES

Transcolor is a subsidiary of Alleco, Inc. ("Alleco"). On June 1, 1992, Alleco filed a voluntary Chapter 11 bankruptcy petition in this Court, in Case No. 92–1–3268–SD, in which it described itself as a "holding company." The petition also indicated that 100% of the common stock of Alleco was owned by MML, Inc.[4] The petition

---

erally liable to the plaintiff for fraudulent misrepresentation, fraudulent concealment and fraudulent conveyance. Since then, the parties and the Chapter 7 trustee have stipulated that damages sustained by the plaintiff shall be entered as a final judgment against the defendants in the amount of Seven Million Dollars ($7,000,000), plus post judgment interest from the date of judgment. The trustee's consent to the entry of this judgment is noteworthy because it established her acknowledgment of the plaintiff's standing to bring the instant complaint and the subject matter jurisdiction of the bankruptcy court to decide this controversy, the outcome of which will benefit this bankruptcy estate to the advantage of the general creditor body.

3. The amount of the claim of NCB far exceeded the five other claims that were filed.

4. The defendant, Morton M. Lapides, Sr., owned or controlled all of the interlocking defendant corporations and their subsidiaries:

MML, Inc. ("MML"), was a Maryland corporation that bore Mr. Lapides' initials. MML no longer exists as a separate entity, having merged into a successor corporation, V.R. Holdings, Inc., a Delaware corporation that is now a Chapter 11 debtor in this Court (Case No. 01–5–2239–JS). For this reason, the complaint will be dismissed as to MML.

Alleco's Chapter 11 case (No. 92–1–3268–SD) remains open at this time. "Alleco, Inc., is the corporate successor to a former parent company of Allegheny Pepsi." *United States v. Allegheny Bottling Co.,* 854 F.Supp. 430,

431 n. 1 (E.D.Va.1994). "Allegheny Bottling Company, which had previously conducted business under the name Allegheny Pepsi–Cola Bottling Co., was the exclusive distributor of Pepsi–Cola products in the Baltimore, Richmond, and Norfolk marketing areas... [F]rom 1982 until the beginning of 1985, Allegheny Bottling Company was a subsidiary of the Allegheny Beverage Corporation (now called 'Alleco')." 854 F.Supp. at 432. "... [T]he defendant corporation traded as Allegheny Pepsi–Cola Bottling Co. In July 1987, a few years after Pepsico, Inc. purchased the defendant from Lapides' Allegheny Beverage Corporation, Pepsico changed the defendant corporation's name to Allegheny Bottling Company." *Id.,* n. 4. Alleco owned 100% of the stock of Alleco Financial Corp. Petition, *In re Alleco,* Case No. 92–1–3268–SD. *See also Alleco, Inc. v. IBJ Schroder Bank & Trust Co.,* 745 F.Supp. 1467 (D.Minn.1989); *Alleco Inc. v. Harry & Jeanette Weinberg Foundation, Inc.,* 340 Md. 176, 665 A.2d 1038 (1995).

Alleco Financial Corp. owned 98.5% of the stock of Transcolor, Inc., the other 1.5% of which was owned by public investors.

Transcolor Corp. owned 100% of the stock in Transcolor, Inc., the instant Chapter 7 debtor, a Delaware corporation with its principal place of business in Maryland, which was engaged in the color printing of T-shirts; its subsidiaries were Transcolor West, Transcolor South, and Apparel Funding Group., now known as American Basics Company. Application for Authority to Employ Special Litigation Counsel [P. 25].

disclosed the following corporations that were "directly or indirectly owned, controlled or held, with power to vote, by the debtor (Alleco)": Macke Building Services, Inc. (100%); Alleco Financial Corp. (100%); Transcolor Corp. (98.5%); the debtor in the instant case, Transcolor, Inc. (100%); Transcolor West, Inc. (100%); Transcolor South, Inc. (100%); Valley Rivet Company, Inc. (100%); and Alleco Real Estate Corp. (100%). The corporate resolution attached to the petition identified Morton M. Lapides, Sr. ("Lapides"), as President of MML, Inc., and sole director and shareholder of Alleco. Among Alleco's 20 largest creditors listed were Dean H. Foltz and Henrietta M. Foltz, debenture holders, and First Trust National Association of St. Paul, Minnesota, the trustee under various indentures.

This Court [Derby, J.] confirmed Alleco's Chapter 11 plan of reorganization by order [P. 474] entered September 17, 1993 [5], and as part of the plan, approved the form of an indenture (the "Indenture") executed on October 1, 1993, between Alleco as issuer and NCB as trustee. Plaintiff's Exhibit No. 3. The Indenture obligated Alleco to issue secured notes (the "Secured Notes") to certain creditors (the "Debenture Holders"). Under a supplemental indenture dated July 31, 1995 (the "Supplemental Indenture"), in which NCB continued to serve as trustee, Transcolor was added as an additional obligor on the Secured Notes and thereby became bound to the terms of the Indenture. Plaintiff's Exhibit No. 4. Both documents were executed under seal. The Indentures provided that they were to be governed according to Maryland law. Section 1.12. NCB was given authority as indenture trustee to "institute any actions or judicial proceedings at law or in equity" to collect monies due under the Indentures, Section 5.03(b), and to file proofs of claim in any bankruptcy or insolvency proceedings of the Indenture obligors. Section 5.04. The Indentures contained an exculpatory clause purporting to insulate all individual corporate stockholders, officers and directors from any liability whatsoever. Section 14.01.[6]

Winterland Corporation was a California corporation acquired by Lapides-controlled entities in 1996, which filed bankruptcy in the U.S. Bankruptcy Court for the Northern District of California at San Francisco on August 8, 1997. *Winterland Concessions Co.,* Case No. 97–33693.

5. In the event of a default by the debtor of its obligations to debenture holders under the Indenture, Section 5.9 of the plan provided, in part, as follows:
> ...Valley Rivet Company, Inc., and Transcolor Corp. (including all Transcolor subsidiaries) as well as Morton Lapides shall be bound by the provisions of this Section 5.9 of the Plan, will separately acknowledge the validity and enforceability of this Agreement against each of them, and will agree to waive their respective rights to attempt to challenge or interfere with the enforcement of this Section 5.9 of the Plan, including the right to file a bankruptcy petition to prevent or delay such enforcement. Such

parties shall agree to submit to the jurisdiction of the Bankruptcy Court for the for the purpose of enforcing the provisions of this Section 5.9 of the Plan. In the event the Bankruptcy Court declines to exercise its jurisdiction on this issue, the parties will agree to submit to the jurisdiction of the United States District Court for the District of Maryland...
*Id.*

6. Section 14.01 provided as follows:
> *Personal Immunity from Liability of Incorporators, Shareholders, etc.*
> No recourse under or upon any obligation, covenant, or agreement of this Indenture or of any Note or for any claim based thereon or otherwise in respect thereof shall be had against any incorporator or against any past, present, or future stockholder, officer, or director, as such, of the Company or of any successor corporation either directly or through the Company,

Lapides signed the Supplemental Indenture on behalf of both Alleco and Transcolor. When Transcolor failed to make the payments of principal and interest to NCB required by the Indentures, NCB filed suit in Michigan and obtained the judgment against Transcolor.

NCB discovered that a series of transactions initiated by Lapides in connection with his acquisition of Winterland Corporation caused Transcolor to violate the terms of the Indentures. On August 14, 1996, the first transaction occurred (characterized by the plaintiff as "the Winterland transaction"), by which MML purchased 100% of the stock of Winterland. To finance the purchase, MML borrowed millions of dollars from Gordon Brothers Capital Corporation and Madeleine, LLC, guaranteed by MML and by Mr. and Mrs. Lapides. The Lapideses pledged their residence as collateral for the personal guarantees.

In connection with the Winterland purchase, Transcolor was required to transfer all its business assets to Winterland and to lease its machinery, real property, proprietary rights, intellectual property, customer lists, contract rights and clothing lines to Winterland. Transcolor also gave Winterland an option to purchase the leased assets after a period of years at a price of $5 million. Lapides represented both MML and Transcolor and signed all of the documents on behalf of both corporations. La-

pides, MML and the lenders had agreed that Transcolor would receive $5.4 million in cash and also a $14 million lease agreement to be paid over ten years in return for transferring possession and control of all its assets to Winterland. Instead, on the date of the transaction, Transcolor was paid only $1.3 million, leaving a balance due of $4.1 million.

Two days later, on August 16, 1996, a second transaction occurred known as the "Winterland Revisory Transaction." Instead of Winterland paying the $4.1 million dollar balance to Transcolor, Winterland tendered Transcolor a $4.1 million promissory note. The price of Winterland's purchase option was reduced to $3.5 million and Winterland was given a purchase option on all of Transcolor's leased assets for only $1. As a result, Transcolor lost over $1 million in the transactions. A large portion of the $1.3 million that Transcolor received was transferred immediately to Lapides. Lapides refused another lender's offer to refinance the Winterland purchase because it would have resulted in his losing a degree of company control.

Nine months later, on April 11, 1997, a third transaction known as the "Winterland Settlement Agreement" occurred. Despite the fact that Transcolor had already been rendered insolvent by the August 16, 1996, transaction, Lapides entered into the Winterland Settlement Agreement with the lenders on behalf of Winterland,

whether by virtue of any constitution, statute, or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed that this Indenture and the obligations issued hereunder are solely corporate obligations, and that no such personal liability whatever shall attach to, or is or shall be incurred by, the incorporators, stockholders, officers, or directors, as such, of the Company, or of any successor corporation, or any of them, under or by reason of this Indenture or any Notes or implied therefrom, or rule of law,

or by the enforcement of any assessment or penalty or otherwise; all such liability and any and all such claims being hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of such Notes. Notwithstanding anything contained herein to the contrary, nothing in this Section 14.01 is intended to or shall be deemed to waive, impair or affect the obligations and liabilities under the Financing Documents of the parties thereto. *Id.*

MML and himself, by which MML gave the lenders 80% of its ownership interest in Winterland. In addition, Lapides agreed on behalf of Transcolor to give up 90% of the ten-year, $14 million lease that Transcolor had with Winterland, shortening the lease term by nine years. Therefore, what began for Transcolor as $14 million in guaranteed lease payments for its machinery and $5.4 million in cash ultimately resulted in its receipt of only $1.3 million in cash, much of which went to Lapides personally, and a few months' worth of lease payments. In return, the lenders released the loan guarantees that MML and the Lapideses had given on Winterland's $13 million debt, representing a benefit to Lapides by eliminating his personal liability and that of his wife and thereby saving the family residence. These transactions were the subject of a suit brought by Transcolor against Cerberus Partners, L.P., Madeleine, LLC, and Gordon Brothers Capital Corporation (Adversary proceeding No. 99–5464–JS), in which Transcolor admitted that the subject conveyances were made for no consideration and in order to benefit Lapides. *See Transcolor Corp. v. Cerberus Partners, LP (In re Transcolor)*, 258 B.R. 149 (Bankr. D.Md.2001).

### THE INSTANT COMPLAINT

On August 13, 1999, NCB filed the instant complaint in this Court which indicated that the Supplemental Indenture prohibited Transcolor and Alleco from transferring all or substantially all of their assets unless the transferee assumed their obligations; that the Indenture required Transcolor and Alleco to provide written statements to NCB certifying compliance with the Indentures; and that, in derogation of those requirements, Lapides engaged in the three transactions between August, 1996, through April, 1997, by which he transferred all the assets of Transcolor to Winterland, which were fraudulent transfers as to NCB, and caused Transcolor and Alleco to furnish materially false compliance certificates to NCB which failed to disclose the transactions.

The complaint was premised upon allegations of fraud, fraudulent misrepresentation, fraudulent concealment and fraudulent conveyance. The first two claims arose out of the Indentures entered into by Alleco and Transcolor. After the Winterland Transaction, the Revisory Transaction and the Settlement Agreement, Transcolor and Alleco continued to send false compliance certificates to NCB that concealed their default on the indentures. NCB was unaware that all the assets of Transcolor had been transferred to a different Lapides entity and that the lease had been given up in the Winterland Settlement Agreement. NCB discovered the truth when it failed to receive monthly payments.

After this Court denied the defendants' motions to dismiss, the defendants, including the debtor, Transcolor, answered the complaint and denied having violated the terms of the Indentures and denied owing money to the plaintiff. Answer [P. 37].

### CONCLUSIONS OF LAW

**Conclusion of Law No. 1: The U.S. Bankruptcy Court has subject matter jurisdiction over the instant complaint.**

The filing of a voluntary or involuntary bankruptcy petition commences a case in the bankruptcy court, 11 U.S.C. §§ 301, 303, and creates a bankruptcy estate comprised of every interest held by a debtor in property of any kind as of the petition date, 11 U.S.C. § 541(a). The bankruptcy court in which the case is commenced is the proper forum for its administration and the disposition of motions and adversary proceedings brought by or

against the debtor, debtor-in-possession or the bankruptcy trustee, and third parties regarding property of the debtor or the debtor's estate.[7]

7. Subject matter jurisdiction over bankruptcy matters was conferred by Congress in Sections 157 and 1334 of Title 28 of the U.S.Code (The Judicial Code of the United States).

Section 157 of Title 28 provides:

(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to—

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(C) counterclaims by the estate against persons filing claims against the estate;

(D) orders in respect to obtaining credit;

(E) orders to turn over property of the estate;

(F) proceedings to determine, avoid, or recover preferences;

(G) motions to terminate, annul, or modify the automatic stay;

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

(I) determinations as to the dischargeability of particular debts;

(J) objections to discharges;

(K) determinations of the validity, extent, or priority of liens;

(L) confirmations of plans;

(M) orders approving the use or lease of property, including the use of cash collateral;

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate; and

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

(3) The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

(4) Non-core proceedings under section 157(b)(2)(B) of title 28, United States Code, shall not be subject to the mandatory abstention provisions of section 1334(c)(2).

(5) The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

(c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

(d) The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own mo-

A suit to pierce the corporate veil is not itself an independent cause of action, "but rather is a means of imposing liability on an underlying cause of action." 1 C. Keating & G. O'Gradney, Fletcher Cyclopedia of Law of Private Corporations § 41, p. 603 (1990), *quoted in Peacock v. Thomas,* 516 U.S. 349, 354, 116 S.Ct. 862, 866–67, 133 L.Ed.2d 817 (1996). The underlying cause of action present here is the plaintiff's proof of claim against the debtor's estate and the joint liability which plaintiff seeks to impose against the debtor's insiders. The claim itself is at issue because in its answer to the complaint the debtor disputed its liability on the claim. The insiders' liability on the claim is premised upon their misrepresentations to the plaintiff in conjunction with the Indentures issued by the debtor in the Alleco bankruptcy case. Therefore, in at least six respects, the complaint fits within the scope of the core jurisdiction of the bankruptcy court because it is based upon (1) matters concerning the administration of the estate, 28 U.S.C. § 157(b)(2)(A); (2) allowance or disallowance of claims against the estate, 28 U.S.C. § 157(b)(2)(B); (3) orders in respect to obtaining credit, 28 U.S.C. § 157(b)(2)(D); (4) proceedings to determine, avoid, or recover fraudulent conveyances, 28 U.S.C. § 157(b)(2)(H); (5) confirmations of plans, 28 U.S.C. § 157(b)(2)(L); and (6) other proceedings

tion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

(e) If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties.

28 U.S.C. § 157 (1993).

Section 1334 of Title 28 provides as follows:

1334. Bankruptcy cases and proceedings

(a) Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

(c)(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

(d) Any decision to abstain or not to abstain made under this subsection (other than a decision not to abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title. This subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

(e) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate.

28 U.S.C. § 1334 (1993).

affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, 28 U.S.C. § 157(b)(2)(O).

■■■ To the extent that the instant complaint was filed in this Court against the debtor's alter ego and other nondebtors, it is a "third-party" claim over which this Court also has subject matter jurisdiction as it is "related to" the debtor's bankruptcy case. *Cf. Travelers Ins. Co. v. Goldberg,* 135 B.R. 788 (D.Md.1992); *Southern States Coop., Inc. v. Townsend Grain and Feed Co. (In re L.B. Trucking, Inc.),* 75 B.R. 88 (Bankr.D.Del.1987). In *Celotex Corp. v. Edwards,* 514 U.S. 300, 307–08 n. 5, 115 S.Ct. 1493, n. 5, 131 L.Ed.2d 403 (1995), the Supreme Court classified "related to" proceedings in the following two categories:

> (1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate. *See* 1 Collier on Bankruptcy ¶ 3.01[1][c][iv], p. 3–28 (15th ed.1994). The first type of "related to" proceeding involves a claim like the state-law breach of contract action at issue in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The instant case involves the second type of "related to" proceeding.

*Id.* The issue in *Celotex* was the entitlement of the debtor's judgment creditors to execute on a bond against the debtor's surety, which the Supreme Court found to be "related to" the bankruptcy case and within the jurisdiction of the bankruptcy court. The Court endorsed the test developed by the Third Circuit in *Pacor, Inc. v. Higgins,* 743 F.2d 984 (3d Cir.1984), and adopted by the First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits, to determine whether the Federal courts have jurisdiction "related to" a bankruptcy case, namely

> ... whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*Celotex,* 514 U.S. at 306 n. 6, 115 S.Ct. 1493 (*citing Pacor,* 743 F.2d at 995). *Also citing In re G.S.F. Corp.,* 938 F.2d 1467, 1475 (1st Cir.1991); *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1002, n. 11 (4th Cir.1986), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *In re Wood,* 825 F.2d 90, 93 (5th Cir.1987); *Robinson v. Michigan Consol. Gas Co.,* 918 F.2d 579, 583–584 (6th Cir.1990); *In re Dogpatch U.S.A., Inc.,* 810 F.2d 782, 786 (8th Cir.1987); *In re Fietz,* 852 F.2d 455, 457 (9th Cir.1988); *In re Gardner,* 913 F.2d 1515, 1518 (10th Cir.1990); *In re Lemco Gypsum, Inc.,* 910 F.2d 784, 788, and n. 19 (11th Cir.1990). As the Supreme Court stated in *Celotex:*

> The Second and Seventh Circuits, on the other hand, seem to have adopted a slightly different test. *See In re Turner,* 724 F.2d 338, 341 (2d Cir.1983); *In re Xonics, Inc.,* 813 F.2d 127, 131 (7th Cir.1987); *Home Ins. Co. v. Cooper & Cooper, Ltd.,* 889 F.2d 746, 749 (7th Cir.1989). But whatever test is used, these cases make clear that bankruptcy courts have no jurisdiction over proceedings that have no effect on the debtor.

*Celotex,* 514 U.S. at 308, n. 6, 115 S.Ct. 1493

■ In addition, "[F]ederal bankruptcy jurisdiction over such third-party state-law claims is a species of supplemental jurisdiction." Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 862 (2000). *See Kelley v. Nodine (In re Salem Mortgage Co.)*, 783 F.2d 626 (6th Cir.1986), which held that "related to" jurisdiction existed in the bankruptcy court over a class action suit brought by defrauded mortgagors against debtor-mortgage brokers, their officers and assignees, because the fraud action against all the defendants arose out of the same transactions and involved the same parties. This is analogous to the instant complaint, which alleged that the defendants committed fraud under the very nose of this Court in proceedings pending in the Alleco bankruptcy case.

■ Morton M. Lapides, Sr., and Alleco are insiders of the debtor corporation.[8] The complaint alleged and the plaintiff has proven that Lapides and his other entities owned and controlled the debtor and received fraudulent transfers made by the debtor, and therefore, they are within this Court's subject matter jurisdiction.

On behalf of the debtor's bankruptcy estate, the Chapter 7 trustee has consented to the filing of the instant complaint by the plaintiff, one of the petitioning creditors, in order to establish the liability of the debtor's parent corporation and insider on the plaintiff's fraud claim against the debtor.

An outcome of the instant complaint favorable to the plaintiff will result in serious implications to both Transcolor's Chapter 7 bankruptcy estate and the Chapter 11 estate of Alleco. The determination of liability against both Alleco and Lapides for the debts of the insolvent debtor will enhance the rights of creditors in both cases. The finding of liability and the entry of a substantial judgment against Lapides may result in the satisfaction of the debts of Alleco and the possible referral of Lapides for criminal prosecution for bankruptcy fraud and perjury committed in both cases.[9] These are matters within the purview of bankruptcy court jurisdiction, including the enforcement of its order of confirmation and the vindication of its equitable powers in the punishment of misconduct committed under its aegis by debtors and nondebtors alike.

**Conclusion of Law No. 2: This Court has personal jurisdiction over the defendants.**

■ Lapides and his codefendants are subject to the personal jurisdiction of this Court. "Under Federal Rule of Civil Procedure 4(k)(1)(a), a federal court may exercise personal jurisdiction over a defendant who 'could be subjected to the jurisdiction of a court of general jurisdic-

---

8. The Bankruptcy Code defines an insider of a corporate debtor as "a director, officer or person in control of the debtor," "relatives of directors, officers and persons in control of the debtor;" and "affiliates and insiders of affiliates." 11 U.S.C. § 101(31)(B)(i), (ii) and (iii) (1993). An affiliate of a debtor corporation is defined as "any entity that owns, controls or holds with power to vote 20 percent or more of the outstanding voting stock of the debtor, and any corporation who is an affiliate of such entity." 11 U.S.C. § 101(2) (1993).

9. In the instant case, Lapides testified under oath at the meeting of creditors that he had never heard of Macke, one of his own companies. This is surprising in light of the fact that Alleco was sued by Macke Laundry Service Ltd. Partnership in a case that was appealed to the Fourth Circuit. *See Macke Laundry Serv. Ltd. P'ship v. Alleco, Inc.*, 743 F.Supp. 382 (D.Md.1989), *aff'd*, 908 F.2d 967, 1990 WL 101551 (4th Cir.1990).

tion in the state in which the district court is located.'" *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F.Supp.2d 649, 652 (D.Md.2001). Alleco's confirmed Chapter 11 plan designated this Court as the proper forum having both subject matter and personal jurisdiction over the parties, including Lapides, to decide controversies arising from defaults under the Indenture. By the terms of the confirmed plan, Lapides waived all defenses to such jurisdiction. Additional grounds exist independent of the defendants' consent to jurisdiction or their waiver of objection to jurisdiction under the Alleco plan and Indentures. All of the defendants were properly served and have filed answers to the complaint or have failed to object to the complaint for lack of personal jurisdiction. Fed.R.Civ.P. 4 and 19; Fed. R. Bankr.P. 7004 and 7019.

Joined in the instant suit as a defendant, the insolvent debtor is obviously subject to the personal jurisdiction of the bankruptcy court in which its involuntary Chapter 7 case is pending. It is also a necessary party because of its manipulation by Lapides, its alter ego, to commit fraud against the plaintiff for Lapides' benefit. The suit was brought against the debtor with the approval of the Chapter 7 trustee. The plaintiff is the holder of a claim against the debtor in the form of a judgment entered by the Michigan State court. Its joinder in the instant suit will determine its liability on the claim filed against it by NCB and may permit that liability to be satisfied from non-estate assets by entering a judgment against Lapides.

**Conclusion of Law No 3: The filing of the instant complaint did not violate the automatic stay.**

 NCB properly filed the instant complaint against the debtor in the bankruptcy court without first obtaining relief from the automatic stay of Section 362(a) of the Bankruptcy Code. Despite the apparent silence of the Code on this point, the majority view is that the Code implicitly permits the filing of suit in the bankruptcy court against a debtor without violating the automatic stay. *Arneson v. Farmers Ins. Exch. (In re Arneson)*, 282 B.R. 883, 893 (9th Cir. BAP 2002); *Rein v. Providian Fin. Corp.*, 252 F.3d 1095, 1101–02 (9th Cir.2001); *In re Briarwood Hills Associates*, 237 B.R. 479, 480 (Bankr. W.D.Mo.1999); *Armco, Inc. v. North Atlantic Ins. Co. (In re Bird)*, 229 B.R. 90, 94–5 (Bankr.S.D.N.Y.1999); *Sobel Bldg. Devel. Partners v. Broach (In re Sexton)*, 166 B.R. 421, 428 (Bankr.N.D.Cal.1994); *Civic Ctr. Square, Inc. v. Ford (In re Roxford Foods, Inc.)*, 12 F.3d 875, 878 (9th Cir.1993); *Prewitt v. North Coast Village, Ltd. (In re North Coast Village, Ltd.)*, 135 B.R. 641, 643 (9th Cir. BAP 1992); *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1474 (D.C.Cir.1991); *Ameritrust Co., N.A. v. Opti–Gage, Inc. (In re Opti–Gage, Inc.)*, 130 B.R. 257, 258–59 (Bankr.S.D.Ohio 1991); *Moran Fin. Corp. v. American Consol. Fin. Corp. (In re J.T. Moran Fin. Corp.)*, 124 B.R. 931, 940 (S.D.N.Y.1991); *Lighthouse Bluffs Corp. v. Atreus Enters., Ltd. (In re Atreus Enters., Ltd.)*, 120 B.R. 341, 346 (Bankr.S.D.N.Y.1990); *Citicorp N. Am., Inc. v. Finley (In re Washington Mfg. Co.)*, 118 B.R. 555, 561 (Bankr. M.D.Tenn.1990); *Lee Ludwig & Assocs., Inc. v. Seasport, Inc. (In re American Sports Innovations)*, 105 B.R. 614, 617 (Bankr.W.D.Wash.1989); *Teerlink v. Lambert (In re Teerlink Ranch, Ltd.)*, 886 F.2d 1233, 1237 (9th Cir.1989); *American Spinning Mills, Inc. v. Kubicek (In re American Spinning Mills, Inc.)*, 43 B.R. 365, 367 (Bankr.E.D.Pa.1984). *Contra, Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 993 (2d Cir.1990), *cert. denied*, 502 U.S. 808, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991). "Such suits are the equivalent to the filing of

claims against the estate and allowable under 11 U.S.C. § 501, despite the automatic stay." *Moran,* 124 B.R. at 940. Furthermore, the debtor's Chapter 7 trustee has consented to the filing of the instant suit in this Court by the plaintiff.

In any event, the automatic stay does not bar the assertion of postpetition causes of action against Alleco, Inc. *Bellini Imports v. Mason and Dixon Lines, Inc.,* 944 F.2d 199, 201 (4th Cir.1991). The Alleco bankruptcy case remains open and pending at this time.

If a debtor may be sued in the bankruptcy court without violating the automatic stay, then *a fortiori,* the stay is not violated when suit is filed against a non-debtor in the bankruptcy court. As a non-debtor, Lapides does not enjoy the protection of the automatic stay, *Fidelity Nat. Title Ins. Co. of New York v. Bozzuto,* 227 B.R. 466, 470 (E.D.Va.1998); *In re Venture Properties, Inc.,* 37 B.R. 175 (Bankr. D.N.H.1984); *In re Nashville Album Prods., Inc.,* 33 B.R. 123 (M.D.Tenn.1983), either as guarantor of an obligation of the debtor, *Credit Alliance Corp. v. Williams,* 851 F.2d 119 (4th Cir.1988), or as the debtor's codefendant, *Collier v. Eagle–Picher Indus., Inc.,* 86 Md.App. 38, 585 A.2d 256 (1991). Indeed, both Lapides and Alleco have recently been sued on postconfirmation causes of action in another Federal Court. *General Elec. Capital Corp. v. Alleco Inc.,* 2002 WL 77635 (E.D.Pa., Jan. 17, 2002), and 2001 WL 253850 (E.D.Pa., Mar. 13, 2001). *See also In re Jason Pharmaceuticals, Inc.,* 224 B.R. 315, 322 (Bankr.D.Md.1998).

Whether the automatic stay prevents the filing or maintenance of a cause of action outside the bankruptcy court depends upon whether the suit itself is property of the debtor or the debtor's estate. Federal law, specifically Section 541(a) of Bankruptcy Code casts a wide net over property of the bankruptcy estate, including everything in which a debtor has an interest. State law, however, determines the nature of those interests. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). This Court's determination that the instant suit is not property of the debtor, and therefore is not subject to the automatic stay, dovetails with the legal conclusion reached below that the trustee has no standing to bring the complaint.

**Conclusion of Law No. 4: The plaintiff fulfills the requirement of standing to sue on the instant complaint.**

In the case of *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the Supreme Court set forth the following concise explanation of standing:

Article III of the Constitution confines the federal courts to adjudicating actual "cases" and "controversies." As the Court explained in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471–476, 102 S.Ct. 752, 757–761, 70 L.Ed.2d 700 (1982), the "case or controversy" requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded. The several doctrines that have grown up to elaborate that requirement are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

"All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea,

which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Vander Jagt v. O'Neill,* 226 U.S.App.D.C. 14, 26–27, 699 F.2d 1166, 1178–1179 (1983) (Bork, J., concurring).

The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government.

The Art. III doctrine that requires a litigant to have "standing" to invoke the power of a federal court is perhaps the most important of these doctrines. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin, supra,* 422 U.S., at 498, 95 S.Ct., at 2205. Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked. *See Valley Forge, supra,* 454 U.S., at 474–475, 102 S.Ct., at 759–760. The requirement of standing, however, has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. 454 U.S., at 472, 102 S.Ct., at 758.

Like the prudential component, the constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition. The injury alleged must be, for example, " 'distinct and palpable' " *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) *(quoting Warth v. Seldin, supra,* 422 U.S., at 501, 95 S.Ct., at 2206), and not "abstract" or "conjectural" or "hypothetical," *Los Angeles v. Lyons,* 461 U.S. 95, 101–102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). The injury must be "fairly" traceable to the challenged action, and relief from the injury must be "likely" to follow from a favorable decision. *See Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. [26], at 38, 41, 96 S.Ct. [1917], at 1924, 1925[, 48 L.Ed.2d 450 (1976)]. These terms cannot be defined so as to make application of the constitutional standing requirement a mechanical exercise.

The absence of precise definitions, however, as this Court's extensive body of case law on standing illustrates, *see generally Valley Forge, supra,* 454 U.S., at 471–476, 102 S.Ct., at 757–761, hardly leaves courts at sea in applying the law of standing. Like most legal notions, the standing concepts have gained considerable definition from developing case law. In many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases. *See, e.g., Los Angeles v. Lyons, supra,* 461 U.S., at 102–105, 103 S.Ct., at 1665–1667. More important, the law of Art. III standing is built on a single basic idea—the idea of separation of powers. It is this fact which makes possible the gradual clarification of the law through judicial application. Of course, both federal and state courts have long experience in applying and elaborating in numerous contexts the

pervasive and fundamental notion of separation of powers.

Determining standing in a particular case may be facilitated by clarifying principles or even clear rules developed in prior cases. Typically, however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted. Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative? These questions and any others relevant to the standing inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only "in the last resort, and as a necessity," *Chicago & Grand Trunk R. Co. v. Wellman,* 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1892), and only when adjudication is "consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process," *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). *See Valley Forge,* 454 U.S., at 472–473, 102 S.Ct., at 758–759.

468 U.S. 737, 750–52, 104 S.Ct. 3315, 3324–25.

■ The answer to the question of whether a cause of action to pierce the corporate veil of a corporation in bankruptcy belongs to the bankruptcy trustee as property of the estate or whether it belongs to creditors of the corporation as holders of claims against the bankruptcy estate determines who has standing to sue. *See Sobchack v. American Nat'l Bank & Trust Co. of Chicago (In re Ionosphere Clubs, Inc.),* 17 F.3d 600, 607 (2d Cir.1994) (bankruptcy court determines whether claims belong to the bankruptcy estate or to other claimants based upon State law); *Brandt v. Bassett (In re Southeast Banking Corp.),* 827 F.Supp. 742, 745 (S.D.Fla. 1993), *rev'd in part on other grounds,* 69 F.3d 1539 (11th Cir.1995) ("Whether a claim is direct or derivative is a matter of state law"). "Accordingly, whenever a cause of action 'belongs' to the debtor corporation, the trustee has the authority to pursue it in bankruptcy proceedings." *Mixon v. Anderson (In re Ozark Restaurant Equipment Co.),* 816 F.2d 1222, 1224 (8th Cir.1987) (Arkansas law determined that cause of action to pierce the corporate veil was an action against the corporation and therefore not property of the debtor corporation's estate and hence the trustee lacked standing to sue). Opinions are divided on this issue. Thomas R. Phinney, *The Trustee's Standing to Pursue Alter Ego Claims,* 26 CAL. BANKR. J. 214 (2002).

■ A fundamental reason for this disagreement stems from the confusion over the terms that describe various causes of action against the individuals who comprise the legal entity known as a corporation, described by Chief Justice Marshall as "an artificial being, invisible, intangible, and existing only in contemplation of law." *Trustees of Dartmouth College v. Woodward,* (17 U.S.) 4 Wheat. 518, 636, 4 L.Ed. 629 (1819), *quoted in First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 628–29, 103 S.Ct. 2591, 2601, 77 L.Ed.2d 46 (1983). As the Supreme Court stated in *Anderson v. Abbott,* 321 U.S. 349, 361–62, 64 S.Ct. 531, 537, 88 L.Ed. 793 (1944):

Normally the corporation is an insulator from liability on claims of creditors. The fact that incorporation was desired in order to obtain limited liability does not defeat that purpose. *Elenkrieg v.*

*Siebrecht*, 238 N.Y. 254, 144 N.E. 519, 34 A.L.R. 592 [(1924)]. *See* 7 Harv.Bus. Rev. 496. Limited liability is the rule not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted. But there are occasions when the limited liability sought to be obtained through the corporation will be qualified or denied. Mr. Chief Judge Cardozo stated that a surrender of that principle of limited liability would be made "when the sacrifice is so essential to the end that some accepted public policy may be defended or upheld." *Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84, 95, 155 N.E. 58, 61, 50 A.L.R. 599 [(1926)]; *United States v. Milwaukee Refrigerator Transit Co.*, C.C., 142 F. 247 [(1905)]. *See* Powell, Parent & Subsidiary Corporations (1931) pp. 77—81. The cases of fraud make up part of that exception. *Linn & Lane Timber Co. v. United States*, 236 U.S. 574, 35 S.Ct. 440, 59 L.Ed. 725 [(1915)]; *Rice v. Sanger*, 27 Ariz. 15, 229 P. 397; *Donovan v. Purtell*, 216 Ill. 629, 640, 75 N.E. 334, 1 L.R.A.N.S. 176 [(1905)]; *George v. Rollins*, 176 Mich. 144, 142 N.W. 337; *Higgins v. California, P. & A. Co.*, 147 Cal. 363, 81 P. 1070 [(1905)].

*Id.*

▮▮▮▮▮ Confusion results when courts mistakenly apply the term "piercing the corporate veil" to distinctly different causes of action against the individuals who stand behind the corporation. The true action to "pierce the corporate veil" is brought by parties injured by the corporation to hold liable those corporate officers, directors and/or stockholders whose fraudulent conduct of the corporation caused the injury to the plaintiffs. Liability for harm caused by the corporation is imposed upon the corporation's alter egos by disregarding the corporate form.

▮▮▮▮▮ A completely different cause of action is one brought directly by the corporation (or derivatively by shareholders) against corporate alter egos for damage to the corporation itself through mismanagement or fraud. Because the bankruptcy trustee's standing to prosecute a lawsuit on behalf of the bankruptcy estate is the same as the debtor's standing absent the bankruptcy case, the trustee may assert corporate causes of action in the bankruptcy court against third parties who have injured the debtor, including insiders whose mismanagement may have created the necessity of filing the bankruptcy petition in the first place.[10] *Hudgins v. Shah (In re Sys. Eng'g & Energy Mgt. Associates, Inc.)*, 252 B.R. 635 (Bankr.E.D.Va. 2000); *Cf. Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir.1988)(Chapter 7 trustee had no standing to sue bank on behalf of creditors); *Caplin v. Marine Midland and Grace Trust Co. of New York*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) (Chapter X reorganization trustee did not have standing under the Bankruptcy Act and the Trust Indenture Act to sue a debenture trustee on behalf of debtor's debenture holders). It is to be noted that the instant suit was brought by the Indenture trustee against the debtors Alleco and Transcolor as is-

---

10. However, this Court held in *Transcolor v. Cerberus Partners, LLP (In re Transcolor)*, 258 B.R. 149 (Bankr.D.Md.2001), that parties who counsel or influence a debtor to file bankruptcy, whether or not they are insiders, are not liable to third parties in a collateral proceeding brought in state court for having given such advice, counsel, or persuasion to cause the filing to be made. *Cf. Liebmann v. Pucci (In re Ampat Southern Corp.)*, 128 B.R. 405 (Bankr.D.Md.1991) (corporate officer who did not breach his fiduciary duty to the debtor corporation and who did not receive the benefit of fraudulent transfers was not liable to Chapter 7 trustee).

suers of the debentures and Lapides as their insider.

A number of courts have held that the bankruptcy trustee of a corporation has standing to pierce the corporation's veil to sue the corporation's insiders. *Cf. Schimmelpenninck v. Byrne (In Matter of Schimmelpenninck)*, 183 F.3d 347, 355 (5th Cir.1999) ("Accordingly, to meet its corporate obligations, the corporation may pierce its own corporate veil to reach those who have misused it."); *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1348 (7th Cir.1987) and *S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In re S.I. Acquisition, Inc.)* 817 F.2d 1142, 1152–53 (5th Cir.1987) (creditor's alter ego action belonged to debtor as property of the estate and therefore the corporation may pierce its own corporate veil and hold accountable those who have misused the corporation in order to meet its corporate obligations).

It would seem rather obvious that a corporation cannot sue itself, and that if a corporation has a cause of action against its own officers and directors for injury to itself caused by breaches of fiduciary duty or corporate mismanagement, such an action is a direct one that it may bring without piercing its own corporate veil. In the case of *Ross v. Bernhard*, 396 U.S. 531, 533, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), the Supreme Court addressed both the direct cause of action that a corporation may bring against its own officers, directors and shareholders for damage to itself and the more recently-developed shareholder derivative suit which stockholders may bring when the corporation fails to sue because the defendants who controlled the corporate entity caused the damage:

> [A] corporation, although an artificial being, was commonly entitled to sue and be sued in the usual forms of action, at least in its own State. *See Paul v. Virginia*, 8 Wall. 168, 19 L.Ed. 357 (1869). Whether the corporation was viewed as an entity separate from its stockholders or as a device permitting its stockholders to carry on their business and to sue and be sued, a corporation's suit to enforce a legal right was an action at common law carrying the right to jury trial at the time the Seventh Amendment was adopted.
>
> The common law refused, however, to permit stockholders to call corporate managers to account in actions at law. The possibilities for abuse, thus presented, were not ignored by corporate officers and directors. Early in the 19th century, equity provided relief both in this country and in England. Without detailing these developments, it suffices to say that the remedy in this country, first dealt with by this Court in *Dodge v. Woolsey*, 18 How. 331, 15 L.Ed. 401 (1856), provided redress not only against faithless officers and directors but also against third parties who had damaged or threatened the corporate properties and whom the corporation through its managers refused to pursue. The remedy made available in equity was the derivative suit, viewed in this country as a suit to enforce a corporate cause of action against officers, directors, and third parties. As elaborated in the cases, one precondition for the suit was a valid claim on which the corporation could have sued; another was that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions. Thus the dual nature of the stockholder's action: first, the plaintiff's right to sue on behalf of the corporation and, second, the merits of the corporation claim itself.
>
> Derivative suits posed no Seventh Amendment problems where the action

against the directors and third parties would have been by a bill in equity had the corporation brought the suit. Our concern is with cases based upon a legal claim of the corporation against directors or third parties. Does the trial of such claims at the suit of a stockholder and without a jury violate the Seventh Amendment?

\* \* \* \* \* \*

We have noted that the derivative suit has dual aspects: first, the stockholder's right to sue on behalf of the corporation, historically an equitable matter; second, the claim of the corporation against directors or third parties on which, if the corporation had sued and the claim presented legal issues, the company could demand a jury trial. As implied by Mr. Justice Holmes in *Fleitmann [v. Welsbach Street Lighting Co. of America,* 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505 (1916)]* legal claims are not magically converted into equitable issues by their presentation to a court of equity in a derivative suit. *The claim pressed by the stockholder against directors or third parties "is not his own but the corporation's." Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 522, 67 S.Ct. 828, 831, 91 L.Ed. 1067 (1947).

The corporation is a necessary party to the action; without it the case cannot proceed. Although named a defendant, it is the real party in interest, the stockholder being at best the nominal plaintiff. The proceeds of the action belong to the corporation and it is bound by the result of the suit. The heart of the action is the corporate claim. If it presents a legal issue, one entitling the corporation to a jury trial under the Seventh Amendment, the right to a jury is not forfeited merely because the stockholder's right to sue must first be adjudicated as an equitable issue triable to the court. . .

396 U.S. at 533–38, 90 S.Ct. 733. (Footnotes omitted.) (Emphasis supplied.)

The Fourth Circuit is not at odds with the notion that a creditor has standing to sue to pierce the veil of a debtor corporation. In *Steyr–Daimler–Puch of Am. Corp. v. Pappas,* 852 F.2d 132 (4th Cir. 1988), according to the particular facts presented, the court held that only the Chapter 7 trustee had standing to sue corporate insiders for corporate debts because under Virginia state law, claims against a corporate alter ego belong to the corporation and not to the general creditors.[11] *Accord,*

---

11. The Court premised its conclusion based upon its holding that "Under Virginia law, a corporation has an equitable interest in the assets of an alter ego because the corporation and the alter ego are 'one and the same,'" *Steyr–Daimler,* 852 F.2d at 136, *citing Pepper v. Dixie Splint Coal Co.,* 165 Va. 179, 181 S.E. 406 (1935). However, *Pepper* was a veil-piercing case brought by a creditor against corporate insiders and not a direct action by the corporation against its own officers for mismanagement. The question decided in *Pepper* was "whether or not under the evidence and pleadings the first Dixie Splint corporation, the Dixie Splint co-partnership and the individual partners are liable to the complainant for the performance of the covenants contained in the lease." 181 S.E. at 409. The court based its determination that they were liable upon its finding that

> [I]t is perfectly obvious that the first corporation, the co-partnership, and the second corporation are one and the same *in so far as the appellant here is concerned.* The actual and ultimate control and ownership of the property and business of the three companies was lodged in Litton and Long. Such complete dominance and control by them made the two corporations and the co-partnership, *quoad* the appellant, merely a veil or shadow through which the court will look to the substance of things whenever it would be unconscionable, through corporate fiction or otherwise, to permit the real and responsible parties to escape liability by turning over their property from one

*Fidelity Nat. Title Ins. Co. of N.Y. v. Bozzuto,* 227 B.R. 466, 471 (E.D.Va.1998). However, upon closer examination, it is clear that, strictly speaking, *Steyr–Daimler* was not a veil-piercing case, but a case of a bankruptcy trustee's suit and settlement with corporate insiders on behalf of the debtor's estate for corporate mismanagement and its preclusive effect of barring a later veil-piercing suit by a creditor. In later decisions, the Fourth Circuit recognized that "[i]n a traditional veil-piercing case, a creditor of a corporation seeks to reach the assets of a corporate shareholder or director to satisfy a corporate debt." *C.F. Trust, Inc. v. First Flight Ltd. P'ship,* 2002 WL 1931411 (4th Cir.2002), *citing Perpetual Real Estate Servs. v. Michaelson Props.,* 974 F.2d 545, 548–49 (4th Cir. 1992).

Traditionally, causes of action against corporate alter egos who defraud the corporation's creditors belong exclusively to parties injured by the corporation, including defrauded creditors, and not to the corporation itself. In Maryland, piercing the corporate veil is essentially a cause of action against the corporation and its alter egos, *Fuller v. Horvath,* 42 Md. App. 671, 402 A.2d 134 *cert. denied,* 286 Md. 748 (1979), and not a suit by the corporation against its officers for mismanagement nor a derivative suit by its stockholders on behalf of the corporation. No Maryland cases have been found in which a suit to pierce the corporate veil belonged to the corporation. Every case involved the action of an aggrieved party suing the corporation and its officers, directors or stockholders. *See, e.g., Residential Warranty Corp. v. Bancroft Homes Greenspr*

entity to another. The form changed but the real parties in interest always remained the same. 181 S.E. at 410. *Emphasis supplied.* Thus, the basis of liability of the insiders and the successor corporation for the debts of the debtor corporation was not because the property of the first corporation and that of the defendants was identical, but because the liability of the debtor corporation was imputed to them due to their manipulation of the debtor's property. This is further confirmed by the *Pepper* court's reliance upon the following quotation:

> In the case of *American Railway Express Company v. Downing,* 132 Va. 139, 111 S.E. 265, 268 [(1922)], in speaking of the effect of a company purchasing the entire assets of another company where the selling company owes debts, this is said:
>
> "The consolidated company has in its hands property which, in equity and good conscience *belongs to the plaintiff* to the extent of having his claim satisfied thereby; and, wherever property, or money, is so held, 'the law operating on the acting parties creates the duty, establishes the privity and implies the promise and obligation, on which the action is founded.'" *Brewer v. Dyer,* 7 Cush.(Mass.) (337) 339 [(1851)]. *See, to same effect, Moses v. MacFerlan, 2*

Burr. 1012; Clark on Contracts, section 314, page 757; *Norfolk v. Norfolk County,* 120 Va. 356, 91 S.E. 820 [(1917)]; 2 R.C.L. section 9, pages 749–750. 181 S.E. at 411. *Emphasis supplied.* Stated another way, it is not the debtor's property that is sought to be recaptured in a suit to pierce the corporate veil. Rather, it is the debtor's liability to the creditor that is sought to be shifted to the new entity and the alter egos. Thus, the Fourth Circuit's citation of the *Pepper* decision is understandable if it was cited for the proposition that, in addition to the veil-piercing action brought by the creditors, the corporation itself would have had its own direct cause of action against its officers for mismanagement. Indeed, the case of *Pepper v. Dixie Splint Coal Co.* involved the same corporation and officers as were involved in *Pepper v. Litton,* 308 U.S. 295, 307, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939), the famous case in which the trustee proceeded against the corporate officers to equitably subordinate their claims against the corporation.

Another distinguishing factor in *Steyr–Daimler* is that the trustee recovered money in settlement of a claim of the bankruptcy estate that was held to bar a double recovery by the creditor against the same defendants based upon a similar cause of action.

*ing Valley, Inc.,* 126 Md.App. 294, 728 A.2d 783 (1999); *Travel Committee, Inc. v. Pan American World Airways, Inc.,* 91 Md.App. 123, 603 A.2d 1301 (1992); *Starfish Condo. Ass'n v. Yorkridge Service Corp., Inc.,* 295 Md. 693, 458 A.2d 805 (1983); *Colandrea v. Colandrea,* 42 Md. App. 421, 401 A.2d 480 (1979); *Dixon v. Process Corp.,* 38 Md.App. 644, 382 A.2d 893, *cert. denied,* 282 Md. 731 (1978); *United Elec. Supply Co. v. Greencastle Gardens Section III Ltd. P'ship,* 36 Md. App. 70, 373 A.2d 42 (1977); *Bart Arconti & Sons v. Ames–Ennis, Inc.,* 275 Md. 295, 340 A.2d 225 (1975); *Damazo v. Wahby,* 259 Md. 627, 270 A.2d 814 (1970); *Ace Dev. Co. v. Harrison,* 196 Md. 357, 76 A.2d 566 (1950); *William Danzer & Co. v. Western Md. Ry.,* 164 Md. 448, 165 A. 463 (1933); *Carozza v. Federal Fin. & Credit Co.,* 149 Md. 223, 131 A. 332 (1925); *Bethlehem Steel Co. v. Raymond Concrete Pile Co.,* 141 Md. 67, 118 A. 279 (1922).

The distinction between suits brought by a corporation against its officers and those brought by defrauded parties against a corporation and its officers is the decisive factor in determining questions of standing to sue. In *Drabkin v. L & L Constr. Assoc., Inc. (In re Latin Investment Corp.),* 168 B.R. 1 (Bankr. D.D.C.1993), Judge S. Martin Teel, Jr., held that the bankruptcy trustee had standing to sue third parties who aided and abetted the corporate debtor's insiders in a conspiracy to damage the corporation. In so holding, Judge Teel made the essential decision regarding the trustee's standing to sue, namely that the cause of action was property of the estate which belonged to the corporate debtor and to the debtor's trustee who succeeded to the debtor's property:

> The trustee succeeds to the property of the debtor's estate. *See* 11 U.S.C. §§ 704(1), 541(a)(1). This property in-

cludes all causes of action the debtor could have brought outside bankruptcy. Among these causes of action are suits arising from breaches of fiduciary duty by the corporate debtor's principals that could have been brought directly by the debtor or indirectly through shareholder derivative suits. *Pepper v. Litton,* 308 U.S. 295, 307, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939); *Delgado Oil Co. v. Torres,* 785 F.2d 857, 860 (10th Cir. 1986). But the trustee cannot allege causes of action belonging to individual creditors. *Caplin [v. Marine Grace Trust Co.],* 406 U.S. [416] at 434, 92 S.Ct. at 1688. Thus, at issue here is whether at state law the debtor could have brought counts 8 and 9 against the defendants or whether the causes of action alleged in those counts belong to individual creditors.

\* \* \* \* \* \*

The court believes that what is really at issue in counts 8 and 9 is fraud against the corporation. This is hard to discern from the amended complaint because in counts 8 and 9 the trustee never comes right out and labels the underlying conduct as fraud, but instead recites at length the wrongful conduct of the debtor's principals and defendants. But in his pleadings the trustee identifies the underlying conduct as mismanagement of the debtor and misuse of corporate funds. He seeks to hold defendants liable for participating and assisting the debtor's principals in this misconduct, which under the law of corporations constitutes breaches of fiduciary duty.

168 B.R. at 4–5.

This is often a close question, as in the instant case, where Transcolor was mismanaged by Lapides but was also used by him to defraud third parties, including the plaintiff. Here, the trustee and the

plaintiff are not competing for standing. The trustee might have sued Lapides for harm to the debtor, but has not done so, whereas the creditor has sued on its claim for damages based upon a prepetition judgment against the debtor. It is appropriate under these circumstances for the plaintiff to bring the instant suit. For an excellent analysis of the issue, and one that confirms the approach taken by this opinion, *see* Mark L. Prager and Jonathan A. Backman, *Pursuing Alter-ego Liability Against Non-bankrupt Third Parties: Structuring A Comprehensive Conceptual Framework*, 35 St. Louis U.L.J. 657, Spring 1991.

The first two counts of the instant complaint allege that, acting on behalf of Alleco and Transcolor, Lapides committed fraudulent concealment and made false misrepresentations to NCB, upon which causes of action NCB has standing to sue in this Court, as the party defrauded by the debtor and its codefendants. In addition, NCB has standing to sue the debtor and its codefendants in the bankruptcy court according to the terms of the Indentures issued pursuant to Alleco's plan of reorganization confirmed by this Court (Derby, J.).

**Conclusion of Law No. 5: The trustee does not have standing to bring the instant complaint because the cause of action is not property of the estate.**

▆▆▆▆ In the instant complaint for damages to creditors caused by the fraudulent conduct of the debtor corporation and others such as corporate affiliates or directors, the bankruptcy trustee does not have standing to sue the third parties because the cause of action belongs to the injured creditors and not to the debtor corporation. *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991). Because the bankruptcy trustee stands in the shoes of the debtor corpora-

tion, she has standing only to bring those actions that the debtor corporation could have brought. *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir.1995). *Accord, Tese–Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*, 289 B.R. 563, 573–74 (Bankr.S.D.N.Y.2003). The fact that the debtor was acting in *pari delicto* with third parties whose wrongdoing allegedly injured the debtor bars recovery by the trustee on a suit filed against those same third parties on behalf of the debtor's estate. *Cf. Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 358 (3d Cir. 2001)(the bankruptcy trustee's status as an innocent successor does not prevent the application of the *in pari delicto* defense). *Accord, Terlecky v. Hurd (In re Dublin Secs.)*, 133 F.3d 377, 380 (6th Cir.1997); *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 825–27 (2d Cir. 1997) *Sender v. Buchanan (In re Hedged–Investments Assocs., Inc.)*, 84 F.3d 1281 (10th Cir.1996); *Hirsch*, 72 F.3d at 1093–94; *Shearson*, 944 F.2d at 120.

**Conclusion of Law No. 6: The plaintiff was entitled to bring the instant suit for recovery of fraudulent conveyances against Lapides and Alleco with the express consent of the Chapter 7 trustee.**

▆▆▆▆ Ordinarily, the power to avoid fraudulent conveyances and preferential transfers under the Bankruptcy Code is the exclusive province of the bankruptcy trustee. *Best Mfg., Inc. v. White Plains Coat & Apron Co. (In Matter of Daniele Laundries, Inc.)*, 40 B.R. 404, 408 (Bankr. S.D.N.Y.1984) ("It is axiomatic that a duly qualified trustee in bankruptcy represents the estate and is the only proper party to maintain any action under Code § 544(b), or the predecessor provision in § 70(e) of the former Bankruptcy Act, and that the creditors of the estate have no right to

proceed independently in their own names or on behalf of the estate.")

■■■■ However, limitations had already tolled against the trustee by the time the instant complaint was brought by NCB. Section 546(a) of the Bankruptcy Code sets time limits on the trustee's exercise of these powers, namely the earlier of two years from date of the order for relief, one year from the date of the trustee's appointment or the date the case is closed.[12] Additionally, Section 548 of the Code provides that the trustee may only recover a fraudulent conveyance made by the debtor within one year before the filing of the petition.[13]

■■■ The trustee timely filed an action to recover preferential transfers and obtained a judgment by default against MML, Inc. She did not proceed to judgment against the co-defendant, V.R. Holdings. Inc., because she noted that it had filed bankruptcy. The trustee did not file any other actions within the two-year limitations period to avoid fraudulent or preferential transfers. Therefore, the record is clear that the trustee did not file an action against these defendants to recover a fraudulent conveyance. Instead, she has consented to the filing of the instant suit by NCB against the debtor with the understanding that the estate will share in any recovery. *Cf. Jefferson Co. Bd. Of County Comm'rs v. Voinovich (In re The V. Companies)*, 292 B.R. 290 (6th Cir. BAP 2003); *F.D.I.C. v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125 (2d Cir.1992); *In re Saunders*, 101 B.R. 303 (Bankr.N.D.Fla. 1989); *In re Central Heating and Air Cond., Inc.*, 64 B.R. 733 (N.D.Ohio 1986). Therefore, even if one were to assume that the trustee had standing to bring the instant suit, she has abandoned its prosecution in the bankruptcy court to NCB. *Fidelity Nat. Title Ins. Co.*, 227 B.R. at 470–71. As a result, the creditors of the estate will participate *pari passu* in any recovery by the plaintiff.

The complaint makes out a case against the defendants for fraudulent convey-

12. Section 546(a) provides:

546. Limitations on avoiding powers

(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—

(1) the later of—

(A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

11 U.S.C. § 546(a).

13. Section 548(a)(1) provides:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1).

ances. These transactions were undertaken by Lapides on behalf of Alleco and Transcolor while Transcolor was insolvent and each transaction was made without fair consideration. The transactions between the related entities were pervaded by fraud because of the common ownership and control by Lapides of the transferors, Alleco and Transcolor and the transferee, Winterland. The Winterland Settlement Agreement signed by Lapides contained a confidentiality provision that required the parties to conceal the settlement agreement from NCB. The transactions were not conducted in the normal course of business dealings because Transcolor's president was unaware of them and was not even consulted about them. Lapides benefitted personally from the transactions and by his ownership of MML.

None of the three agreements was an "arms-length" transaction. Transcolor, Alleco and MML were instrumentalities of Lapides, functioning solely for his personal gain, and he was their alter ego. He dominated each of them as CEO, chairman of the board and sole owner. All corporate decisions for Transcolor were made by Lapides. The records of the corporations were intertwined. Employees were transferred between companies at Lapides' direction. Lapides took payments from Transcolor at will. He had the right to approve every corporate check that was written. Corporate records and documents were missing from all the companies which Lapides owned. All four corporations were headquartered in the same office, with the name "Winterland" printed on the door and the rent paid by Winterland. Lapides hired and fired all corporate officers. All of the corporations were insolvent.

There is convincing evidence that none of the three transactions was for fair value.

Transcolor filed no proof of claim in the Winterland bankruptcy.

**Conclusion of Law No. 7: Section 544 of the Bankruptcy Code cannot confer standing upon a bankruptcy trustee to bring suit on behalf of creditors of the estate against nondebtor third parties, other than to recover fraudulent conveyances and preferences.**

Some courts have held that because Section 544 of the Code gives the trustee standing to sue on behalf of creditors for the purpose of recovering fraudulent conveyances, she may also stand in the creditors' shoes to bring causes of action personal to them on their behalf. District courts in the Fourth Circuit have rejected this view, stating that "nothing in [Section 544] indicates that the trustee is an agent for the creditors." *Sigmon v. Miller–Sharpe, Inc. (In re Miller)*, 197 B.R. 810, 815 (W.D.N.C.1996). Rather, "[t]hose cases holding that the trustee cannot bring claims on behalf of the creditors are more consistent with the statutory language and (discernible) legislative intent of the section," 197 B.R. at 815, *citing Ozark Restaurant Equipment Co.*, 816 F.2d 1222, 1229. *Accord, Fidelity Nat'l. Title Ins. Co. of N.Y. v. Bozzuto*, 227 B.R. 466, 472 (E.D.Va.1998).

**Conclusion of Law No. 8: The plaintiff is entitled to "pierce the corporate veil" in order to establish the individual liability of the insiders for the plaintiff's claim against the debtor's estate, according to Maryland law.**

By their terms, the Indentures underlying the instant lawsuit are subject to interpretation according to the law of Maryland. Maryland law holds that the intent of the parties to the agreement "governs the issue of whether the choice of law provision applies to contract-related tort claims." *Superior Bank, F.S.B. v.*

*Tandem Nat'l Mortg., Inc.,* 197 F.Supp.2d 298, 309 (D.Md.2000).

■■■■ "The well-settled rule in Maryland is that courts will pierce the corporate veil only when necessary to prevent fraud or a paramount inequity." *Bart Arconti & Sons, Inc., v. Ames–Ennis, Inc.,* 275 Md. 295, 310, 340 A.2d 225 (1975), *quoted in Choice Hotels Intern., Inc. v. Manor Care of America, Inc.,* 143 Md. App. 393, 401, 795 A.2d 145, 150 (2002). The rule regarding paramount equities is that, "[w]hen substantial ownership of all the stock of a corporation in a single individual is combined with other factors clearly supporting disregard of the corporate fiction on grounds of fundamental equity and fairness, courts have experienced 'little difficulty' and have shown no hesitancy in applying what is described as the 'alter ego' or 'instrumentality' theory in order to cast aside the corporate shield and to fasten liability on the individual stockholder." *Travel Committee, Inc. v. Pan American World Airways, Inc.,* 91 Md.App. 123, 158–59, 603 A.2d 1301, 1318 (1992) (*quoting DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 685 (4th Cir.1976)). The factors used in analyzing whether a paramount equity should be enforced include, *inter alia,* "whether the corporation was grossly undercapitalized, ... the dominant stockholder's siphoning of corporate funds, ... the absence of corporate records, and the corporation's status as a façade for the stockholders' operations.'" 91 Md.App. at 159, 603 A.2d at 1318–19 (*quoting DeWitt,* 540 F.2d at 686–87), *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.,* 126 Md.App. 294, 728 A.2d 783 (1999). "Corporations usually are separate and distinct from their shareholders, insulating those shareholders from liability. Nevertheless, in certain circumstances, a court will 'lift the corporate veil' to impose personal liability. A court may lift the corporate veil to find the principals liable if there has been a fraud." *Travel Committee, Inc.,* 91 Md.App. at 157, 603 A.2d at 1317. *See also Ace Development Co. v. Harrison,* 196 Md. 357, 367, 76 A.2d 566, 570 (1950); *Colandrea v. Colandrea,* 42 Md.App. 421, 401 A.2d 480 (1979); Denise L. Speer, *"Piercing the Corporate Veil" in Maryland: An Analysis and Suggested Approach,* 14 U.Bal.L.Rev. 311 (1985).

■■■ The corporate veil will be pierced in the instant case because this Court is satisfied that the plaintiff has made a sufficient showing of fraud on the part of the defendants by clear and convincing evidence. In *Colandrea v. Colandrea, supra,* the Maryland Court of Special Appeals stated:

In order to establish fraud on the part of Mrs. Colandrea it was necessary that appellant provide clear and convincing proof, *See Garris v. Dickey,* 22 Md.App. 618, 630, 325 A.2d 156 (1974), *cert. den.,* 273 Md. 720 (constructive fraud), *Loyola Fed. S. & L. Ass'n v. Trenchcraft, Inc.,* 17 Md.App. 646, 656, 303 A.2d 432 (1973), of each of the following five elements: (1) a material representation of a party was false, (2) falsity was known to that party or the misrepresentation was made with such reckless indifference to the truth as to impute knowledge to him, (3) the misrepresentation was made with the purpose to defraud (scienter), (4) the person justifiably relied on the misrepresentation, and (5) the person suffered damage directly resulting from the misrepresentation. *Suburban Properties Management, Inc. v. Johnson,* 236 Md. 455, 460, 204 A.2d 326 (1964); *Accord Walsh v. Edwards,* 233 Md. 552, 558, 197 A.2d 424 (1964); *Lustine Chevrolet v.*

*Cadeaux,* 19 Md.App. 30, 34–5, 308 A.2d 747 (1973).

42 Md.App. at 428, 401 A.2d at 484–85.

**Conclusion of Law No. 9: In addition to piercing the corporate veil to hold Lapides liable for the corporation's fraud, the evidence also establishes his independent liability for torts committed by him as an agent of the corporate debtor.**

 "A corporate officer, director or employee, while ordinarily not responsible for the contractual debts of a corporation, may nevertheless be held personally liable for his or her own fraudulent conduct committed on behalf of the corporation which causes injury to another. Stated differently, one whose actions taken in bad faith cause tortious injury to another is not insulated from personal liability merely because the malefactor was a corporate officer, director or employee acting within the scope of employment at the time of the commission of the fraud." *Hemelt v. Pontier (In re Pontier),* 165 B.R. 797, 799 (Bankr.D.Md.1994). In so holding, this Court quoted the following excerpt from the opinion of the Court of Appeals of Maryland in the case of *Tedrow v. Deskin,* 265 Md. 546, 550–51, 290 A.2d 799 (1972):

> "The general rule is that corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body." *Fletcher v. Western Nat. Life Ins. Co.,* 10 Cal. App.3d 376, 89 Cal.Rptr. 78 (1970); *Miller v. Simon,* 100 Ill.App.2d 6, 241 N.E.2d 697 (1968); *Pacific & Atlantic Shippers, Inc. v. Schier* [109 N.H. 551], 258 A.2d 351 (N.H.1969); *McGlynn v. Schultz,* 95 N.J.Super. 412, 231 A.2d 386 (1967); *Faulk v. Milton,* 25 A.D.2d 314, 268 N.Y.S.2d 844 (1966); 3 *Fletcher Cyclopedia Corporations* § 1135 (rev.vol.

1965). Of course, participation in the tort is essential to liability. If the officer takes no part in the commission of the tort committed by the corporation, he is not personally liable therefor unless he specifically directed the particular act to be done, or participated or cooperated therein. *Fletcher v. Havre De Grace Fireworks Co.,* 229 Md. 196 [177 A.2d 908] (1962); *Levi v. Schwartz,* 201 Md. 575, 583 [95 A.2d 322] (1953); *Buck v. Clauson's Inn at Coonamessett, Inc.,* 349 Mass. 612, 211 N.E.2d 349 (1965); *Martin v. Wood,* 400 F.2d 310 (3d Cir.1968); 3 *Fletcher Cyclopedia Corporations* § 1137 (rev.vol.1965). It would seem, therefore, that an officer or director is not liable for torts of which he has no knowledge, or to which he has not consented. *Martin v. Wood, supra.* Thus, e.g., to make an officer or corporation liable for the negligence of the corporation there must have been upon his part such a breach of duty as contributed to, or helped to bring about, the injury; he must have been a participant in the wrongful act. *United States Liability Ins. Co. v. Haidinger–Hayes, Inc.* [1 Cal.3d 586], 83 Cal.Rptr. 418, 463 P.2d 770 (1970); *Sensale v. Applikon Dyeing & Printing Corp.,* 12 N.J.Super. 171, 79 A.2d 316 (1951).

*Hemelt v. Pontier,* 165 B.R. at 799–800. *See also State, Cent. Collection Unit v. Kossol,* 138 Md.App. 338, 771 A.2d 501 (2001); *Yates v. Hagerstown Lodge No. 212 Loyal Order of Moose,* 878 F.Supp. 788 (D.Md.1995); *Popham v. State Farm Mut. Ins. Co.,* 333 Md. 136, 634 A.2d 28, 38 (1993); *Metromedia Co. v. WCBM Maryland, Inc.,* 327 Md. 514, 519–20, 610 A.2d 791, 794 (1992); *St. James Const. Co. v. Morlock,* 89 Md.App. 217, 597 A.2d 1042 (1991); *GAI Audio of New York, Inc. v. Columbia Broadcasting System, Inc.,* 27 Md.App. 172, 340 A.2d 736, (1975); *Till-*

*man v. Wheaton–Haven Recreation Ass'n, Inc.*, 517 F.2d 1141 (4th Cir.1975). In *Stratton v. Miller*, 113 B.R. 205, 211 (D.Md.1989), Chief Judge Alexander Harvey stated that "Maryland law requires that a defendant must willfully aid in execution of a fraudulent scheme to be held liable as a participant in a fraud," *citing Etgen v. Washington County Bldg. & Loan Ass'n, Inc.*, 184 Md. 412, 418, 41 A.2d 290 (1945).

The Maryland Court of Appeals has also spoken regarding the necessary elements required to prove a cause of action for fraud, deceit or intentional misrepresentation in the case of *B.N. v. K.K.*, 312 Md. 135, 149, 538 A.2d 1175, 1182 (1988):

> (1) that a representation made by a party was false; (2) that either its falsity was known to that party or the misrepresentation was made with such reckless indifference to truth to impute knowledge to him; (3) that the misrepresentation was made for the purpose of defrauding some other person;(4) that that person not only relied upon the misrepresentation but had the right to rely upon it with full belief of its truth, and that he would not have done the thing from which damage resulted if it had not been made; and (5) that that person suffered damage directly resulting from the misrepresentation.

*Id.* The individual liability of Morton M. Lapides, Sr. to the plaintiff is obvious. There is no doubt that Lapides was the corporate owner who directed the perpetration of the corporate fraud committed in this case. He orchestrated the fraudulent transfer of the assets of Transcolor to Winterland in fraud of the plaintiff. It was he who personally reaped the benefits from the transfer by eliminating the liability of his wife and himself on their personal guarantees. Not surprisingly, it was he who instructed his corporate subordinates to falsify the compliance certificates required under the indentures to keep the knowledge of the transfers from the plaintiff as indenture trustee. And it was he who testified falsely at trial that such nondisclosure was "not material."

In confirming Alleco's Chapter 11 plan of reorganization in 1993, the Court [Derby, J.] necessarily found that debtor acted in good faith and in compliance with applicable law. *In re Transcolor Corp.*, 258 B.R. 149 (Bankr.D.Md.2001). However, the actions of Alleco after that date enjoy no presumption of good faith.

Despite the provision in the Supplemental Indenture that prohibited Transcolor from transferring all or substantially all its assets unless the transferee assumed its obligations under the Indenture, Transcolor transferred all of its assets to Winterland without Winterland's assumption of the obligations of Alleco or Transcolor. The Indentures were also violated by the transfer by Transcolor and Alleco of any Transcolor assets to any affiliate of Transcolor or Alleco or for the benefit of any officer or stockholder of Alleco or Transcolor. The transactions in question were not for fair value and they ultimately benefitted Lapides because he owned all of the corporate entities involved.

As the party in control of both Alleco and Transcolor, Lapides owed a fiduciary duty to NCB as trustee of the Indentures to disclose the noncompliance by the two corporations with the terms of the plan and indentures. The concealment of the financial conditions of both corporations that he owned and controlled and their unauthorized transfers of assets amounted to material misrepresentations of fact for which he will be held personally liable. Lapides committed fraud when he covered up the material fact of Transcolor's insolvency. Alleco and Transcolor not only

failed to disclose material facts of which they were required to make full disclosure, they actively misrepresented those facts by submitting false compliance certificates and by concealing from NCB the three transactions.

**Conclusion of Law No. 10: Exculpatory clauses in the Indentures will not be recognized or be given legal effect where to do so would permit the defendants to escape liability for the perpetration of a fraud.**

 Certain exculpatory provisions contained in the Indentures that purported to insulate Lapides from liability will not be enforced by this Court because these provisions are unenforceable in a court of equity in light of the fraud, misrepresentation, bad faith and intentional wrongdoing committed by one who asserts the clause as a defense. *Adloo v. H.T. Brown Real Estate, Inc.,* 344 Md. 254, 686 A.2d 298 (1996); *Wolf v. Ford,* 335 Md. 525, 644 A.2d 522 (1994); *Martin Marietta Corp. v. International Telecom. Satellite Org.,* 991 F.2d 94 (4th Cir.1992); *Kline v. Chase Manhattan Bank, N.A.,* 43 Md.App. 133, 403 A.2d 395 (1979). *Cf. In re Reliance Securities Litig.,* 135 F.Supp.2d 480 (D.Del.2001); *BancBoston Mortg. Corp. v. Ledford (In re Sikes),* 184 B.R. 742 (Bankr.M.D.Tenn.1995).

**Conclusion of Law No. 11: The plaintiff has conclusively proved that it was damaged by the defendants' fraudulent conduct.**

 NCB and the debenture holders were damaged by the defendants' misrepresentations and concealment of facts because by the time they discovered the truth it was too late to take any steps to preserve the assets. There is proof that NCB relied on the defendants' misrepresentations and that NCB did not know about any of the fraudulent transactions. As the director of an insolvent corporation, Lapides ignored his fiduciary duty to the company's creditors. *Spinoso v. Heilman (In re Heilman),* 241 B.R. 137, 169 (Bankr. D.Md.1999)("The types of fiduciary capacity intended by Congress to render a debt nondischargeable are persons in positions of ultimate trust, such as public officers, executors, administrators, guardians, trustees of express trusts, attorneys and corporate directors.") *Cf. Airlines Reporting Corp. v. Ellison (In re Ellison),* 296 F.3d 266 (4th Cir.2002) (Because nondischargeability complaints can only be brought by creditors, not by trustees, and because Chapter 7 debtor corporations do not receive discharges, creditors should be entitled to sue insiders for the determination of nondischargeability of debts).

The testimony of Lapides that he did not believe that the transactions needed to be reported to NCB is unworthy of belief. There existed an obvious conflict of interest because both Lapides and his counsel represented Winterland, MML, Transcolor and Lapides. Each and every one of the transfers is voidable pursuant to the law of Maryland.

**Conclusion of Law No. 12: Based upon all of the evidence, this Court concludes that the defendants intended to deceive and defraud NCB and that NCB sustained damages in the stipulated amount of Seven Million Dollars.**

On April 17, 2001, the Chapter 7 trustee and the parties filed a stipulation that Seven Million Dollars ($7,000,000.00) [14] is the amount of damages to be awarded against Lapides and Alleco, jointly and

---

**14.** The $7 million total represents $6,772,161 in compensatory damages and $227,839 in interest.

severally, in favor of NCB and the Chapter 7 trustee, plus postjudgment interest from date hereof.

For these reasons, the complaint will be granted and judgment will be entered against the defendant Morton M. Lapides, Sr., in the amount of Seven Million Dollars ($7,000,000.00). The plaintiff's claim against Transcolor will be allowed in the same amount without the necessity of entering a separate judgment against the debtor and Alleco. Because judgments have already been entered against Alleco and Transcolor in the Michigan State court, it is unnecessary to do so here. *See Heckert v. Dotson (In re Heckert)*, 272 F.3d 253 (4th Cir.2001).

ORDER ACCORDINGLY.